## Case No. 10,326.

### The NORTHFIELD.

### The HUNTER.

[4 Ben. 112.] [1]

District Court, S. D. New York. April, 1870.[2]

COLLISION IN NEW YORK HARBOR — STEAMBOATS CROSSING—WRONGFUL STOPPING—SPEED.

1. The steam-tug H., with a schooner lashed to her port side, was on her way from Hoboken, N. J., to a place south of Governor's Island. The steamboat N., a ferry-boat running from New York to Staten Island, left her slip at Whitehall, and swung around with the ebb tide, on a port helm, changing her direction from south to south-west, until she should be clear of Governor's Island, when her course would be about south, to Staten Island. The course of the H. was about south. The N. was going from ten to twelve knots an hour and the H. about two. When the vessels were about 300 yards apart, the H., without giving any signal, stopped and backed. The N. was then on a port helm, intending to pass under the stern of the H. As soon as the stopping of the H. was seen, the N. put her helm hard a-port, and also stopped her engine and attempted to reverse it, but, owing to her speed, it was only on the third attempt that the engineer was able to get the engine to pass the centre. The engine made one or two turns back before the collision. The N.

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

[2] [Affirmed by circuit court. Case unreported. Decree of the circuit court affirmed by supreme court in 154 U. S. 629, 14 Sup. Ct. 1184.]

struck the schooner in the side, injuring her so that she sank. The excuse given by the H. for stopping was, that the cleets to which the lines that held the schooner were fastened, were so loose that it was feared that the swell caused by the near passage of the N. ahead of her, where it was supposed the N. intended to pass, would have caused the breaking loose of the schooner. A libel was filed on behalf of the schooner against both steamboats. Held, that, as the vessels were crossing, and the N. had the H. on her starboard side, it was the duty of the H. to keep on, and of the N. to keep out of her way.

[Cited in The Britannia. 34 Fed. 553; S. C. 153 U. S. 142, 14 Sup. Ct. 799.]

2. The H., therefore, was in fault in stopping and backing.

[Cited in The Britannia, 34 Fed. 552; The Fountain City, 10 C. C. A. 278, 62 Fed. 91. Distinguished in dissenting opinion in The Britannia, 153 U. S. 153, 14 Sup. Ct. 803.]

3. The excuse set up by her for so doing was itself a fault. She had no business to be navigating with cleets so loose.

4. The N. was not in fault in her rate of speed, that being shown to be her usual rate.

5. She had the right to assume that the H. would keep on, and to shape her own course so as to pass under the stern of the H., if the latter kept on.

[Cited in The Susquehanna, 35 Fed. 323.]

6. The stoppage of the H. was the cause of the collision; and the inability on the part of the N. to reverse her engine before she did, was not a fault.

[Cited in The St. Johns. 34 Fed. 766; The Britannia, 153 U. S. 142, 14 Sup. Ct. 799.]

7. The H. was solely liable for the damage.

In admiralty.

James C. Carter, for libellant.
Beebe, Donohue & Cooke, for the Hunter.
Charles A. Rapallo, for the Northfield.

BLATCHFORD, District Judge. This is a libel filed by the owner of the three-masted schooner Hero, against the side-wheel steamboat Northfield and the screw steam-tug Hunter, to recover for the damages sustained by him, claimed to amount to $4,500, by the sinking of the schooner, with a cargo of one hundred and fifty-seven tons of coal on board of her, which she was transporting, for hire, at the time, and some personal effects and provisions belonging to the libellant, the whole having been totally lost, in consequence of a collision which occurred between the schooner and the Northfield, on the morning of the 18th of May, 1868, between ten and eleven o'clock, at a point between the Battery and Governor's Island, in the harbor of the city of New York, just where the East river forms a junction with the North river. The schooner was in tow of the Hunter, being lashed to the port side of the Hunter, and was on her way from Hoboken, in New Jersey, where she had taken on board her cargo of coal, to a place below and south of Governor's Island, there to be left by the Hunter and anchored, until she should be taken in tow by another and more powerful steam-tug, to be carried through Hell Gate, on her way to New Haven, in Connecticut, whither

she was bound. The Northfield was on her way, as a ferry-boat, from her slip at Whitehall to Staten Island. The tide was strongly ebb. The Hunter and the schooner had approached near to the Battery, and were in the North river ebb tide, heading down, with such tide, to a point to the westward of Governor's Island. The Northfield, as she came out of her slip, swung around, with the ebb tide, on a port helm, so as to pass from a course about south to a course about southwest, until she should be clear of Governor's Island, and then make her course about south, to Staten Island. The course of the schooner and the Hunter was about south. The courses of the Hunter and the Northfield were, therefore, approaching each other and crossing each other, and they were so near to each other as to involve risk of collision, if neither should make any movement to keep out of the way of the other. Under these circumstances, the Northfield had the Hunter on her own starboard side, and it was the duty of the Northfield, under article 14 of the act of April 29th, 1864 (13 Stat. 60), to keep out of the way of the Hunter and the schooner. It was equally the duty of the Hunter, under article 18 of the same act, to keep her course. The Northfield was going at a speed of from ten to twelve knots an hour through the water. The Hunter was a weak tug, and was not going more than two knots an hour through the water. The Northfield was on a port helm all the time from the time she left her slip up to the collision. She saw the Hunter and her tow, and, according to the clear testimony of those in charge of her, recognizing her duty to keep out of the way, ported her helm, to a sufficient extent, in view of her own speed and of the progress which she saw the Hunter and her tow were making, to enable her to pass safely under the stern of the Hunter and her tow. She was thus swinging all the while from the south towards the west, with her head. When, however, the Hunter and her tow were about three hundred yards distant from the Northfield, the Hunter, instead of keeping her course, stopped her engine. The moment this was seen by the Northfield, her engine was slowed and stopped, and an effort was made to reverse it, and her helm was put hard to port. The engine of the Hunter, after being stopped, was backed, and then started ahead again before the collision. The speed of the Northfield was so great, when her engine was stopped, that, when her engineer, on receiving two bells to back, gave steam to back, the resistance of the water to the wheels prevented the engine from backing over the centre, and he gave a quarter of a turn ahead, and then gave steam to back a second time, and the engine again refused to pass the centre in backing, and he gave a quarter of a turn ahead a second time, and then gave steam to back a third time, and, on this trial, the centre was passed in backing, and her engine

made one or two revolutions backward before the collision, but her speed was not materially diminished, and her stem struck the port side of the schooner just forward of the schooner's mizzen rigging, and not over thirty feet from the schooner's stern, and cut a hole through her side and penetrated some distance into her cargo of coal, from the effects of which blow she soon sank.

It is quite clear, from the testimony of those on board of the Hunter, that, if the Hunter had not stopped at all, but had kept her course, the Northfield would have passed safely under the stern of the schooner and the Hunter. The stopping by the Hunter was the causa causans of the collision. The excuse set up by the Hunter, in her answer, for stopping, is, that the schooner was attached to the Hunter by lines fastened to cleets on the schooner, which cleets the owner and claimant of the Hunter, who was on board of her at the time, was fearful would loosen if any extra strain should come upon them, and let the schooner go adrift; that, although the probabilities were that, if both vessels had kept on their respective courses, there would have been no collision, and the Northfield would have passed ahead, yet such course would have brought the vessels in such close proximity as to render it probable that the waves made by the Northfield would have broken the schooner adrift; and that, with a view to save any such result, and to prevent any possible contingency of a collision, the Hunter was stopped, to allow the Northfield to pass ahead a proper distance. It is quite apparent, from the evidence, that those on board of the schooner and those on board of the Hunter entirely mistook the purpose of those in charge of the Northfield. The Northfield, from the position of her slip, headed to the south, as she came out of it, and, as she swung around, from the south towards the west, on a port helm, her heading would, up to a certain time, if her keel had been projected forward in a straight line, have carried her across the bows of the Hunter and her tow. But, the swinging of the Northfield, up to the time the Hunter stopped, was gradual, based upon the visible movement of the Hunter forward, and upon the speed of the Northfield, and those in charge of the Hunter, knowing that it was the duty of the Northfield to keep clear of the Hunter, ought not to have assumed that the Northfield was intending to pass ahead of the Hunter, rather than astern of her. In so assuming, they took the risk of being wrong in the assumption. They were wrong, in fact, as it is clear, on the proofs, that the Northfield always intended, and all the time manoeuvred so as to pass under the stern of the Hunter. That, on the evidence, was the proper course for her, and it would have been recklessness, involving fault and condemnation, in case of a collision, if she had attempted to pass ahead of the Hunter. The stopping of the

Hunter did not occur in articulo periculi. When she stopped, there was no risk of collision, in fact, if no obstacle were to be interposed in the way of the Northfield, as she was swinging. But, when the Northfield was about three hundred yards distant, the Hunter stopped, and then backed. as has been described, forcing upon the Northfield the necessity of porting still more, and of stopping and reversing. This was a fault in the Hunter, contributing to the collision. The excuse set up by her in regard to the loose cleets on the schooner, is, also, in itself a fault. The evidence shows that the Hunter stopped twice on her way over from Hoboken, in consequence of the looseness of the cleets, in order to avoid getting too near to the swell created by other steamers. It was a fault in her to tow the schooner by lines fastened to cleets on the schooner that were so dangerously loose, as to make it necessary for her to stop where she did, and thus get into the way of the Northfield. There can be no doubt that the Hunter was in fault and responsible for this collision.

There was nothing in the manoeuvring of the Northfield up to the time the Hunter stopped her engine, that can be alleged as a fault in the Northfield. She shaped her course, from the time she first saw the Hunter, so as to pass under the Hunter's stern, and would, on the evidence, have done so, had the Hunter not stopped. Thrown into embarrassment by the stopping of the Hunter. the Northfield put her helm immediately hard a-port, and stopped her engine, and made the attempts to reverse it, before mentioned. Was she, in any respect, in fault, from the time the Hunter stopped? It is alleged that she ought then to have starboarded, and passed ahead of the Hunter and her tow, and between them and Governor's Island. But, it must be remembered, that she was at the time swinging on a port helm, and it seemed to those in charge of her, that she was more likely to avoid hitting the schooner by putting her helm hard a-port, than by starboarding. Although the Hunter stopped her engine, and backed, yet she and her tow were being carried to the south by a strong tide, and, as it was, the Northfield, notwithstanding the delay caused by her unsuccessful attempts to get her engine over the centre in reversing, failed to escape hitting the schooner by but a few feet comparatively. The Northfield is, I think, if necessary, entitled to the benefit of the rule, that the movement forced upon her, by the sudden and unannounced stopping of the engine of the Hunter, when the Northfield and the schooner were at so short a distance apart, is not to be imputed to the Northfield as a fault, even though it may have been a mistaken movement. Knowing that it was the duty of the Northfield to avoid her, the Hunter yet gave no signal, by whistling or otherwise, that she proposed to pass under the Northfield's stern. The North-

field was entitled, under her responsibility to keep clear of the other vessels, to the unembarrassed choice of the means of doing so. The Hunter interfered with that choice, when it had been properly exercised by the Northfield, as the court finds, and interfered with it at so late a moment that a collision was inevitable. But, all that the Northfield could then do to avoid the collision, or lighten the effect of the blow, was done. That her engine twice failed to pass the centre in being reversed, and that she was obliged twice to take a quarter of a turn ahead, in order to pass the centre in reversing, was no fault in the Northfield. There was no defect in her engine. Obliged to stop short at her forward speed, by the sudden stopping of the Hunter, the Northfield had on such headway that the resistance of the water to her paddles, when they were stopped, was too great to be overcome by the application of the steam in the reverse direction, until her headway was sufficiently slackened to make the resistance of the water to the paddles less than the power of the steam. But this predicament of the Northfield was wholly the fault of the Hunter. The Northfield used all the means at her command. Taking the two turns ahead was not improper, and, in fact, was successful, as appears, in securing the reversing, when, without that, it is probable, according to the evidence, that the Northfield would not only have sunk the schooner but would have injured the Hunter. The only possible allegation that could be made against the Northfield would be, that her actual speed before the Hunter stopped was too great. But it was her usual speed, the weather was clear, there was no fog, she saw the Hunter and her tow, and the evidence establishes that there would have been no collision, if the Hunter had not stopped. Nothing is shown to establish that the speed of the Northfield, up to the time the Hunter stopped, was greater than it should have been. Undoubtedly, if it had been enough less than it was to have secured the stoppage of the entire headway of the Northfield, with the manoeuvres in fact adopted by her, after the Hunter stopped, and before the collision, there would have been no collision, or its consequences would have been slight. But this by no means authorizes a conclusion, that the speed of the Northfield was greater than, in view of all the facts, she was entitled to maintain, up to the time the Hunter stopped.

On the whole case, the libel must, as against the Northfield, be dismissed, with costs, and the libellant must recover, against the Hunter, the damages sustained by him, by the collision, with costs.

[On appeal to the circuit court, the decree of this court was affirmed. Case unreported. An appeal was then taken to the supreme court, where the decree of the circuit court was affirmed. 154 U. S. 629, 14 Sup. Ct. 1184.]