### Case No. 4,695.

#### The FAVORITA.

[8 Blatchf. 539.] [1]

Circuit Court, E. D. New York. Aug. 21, 1871. [2]

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]
[2] [Reversing Case No. 4,693. Decree of the circuit court affirmed in 18 Wall. (85 U. S.) 598.]

Benjamin D. Silliman, for libellants.
Benedict & Benedict, for claimants.

WOODRUFF, Circuit Judge. In the afternoon of the 14th of April, 1865, the steam ferry boat Manhassett, the property of the libellants, was running on the ferry between the foot of Main street, Brooklyn, and the foot of Catharine street, New York. On one of her trips, she came out of the Main street slip, and, when she had advanced into the river sufficiently to enable her pilot to see towards the south-west, past the adjacent pier and the vessels lying thereat, the steamship Favorita was seen coming up the river, within such distance from the Brooklyn side as to suggest danger of collision. The pilot of the Manhassett, believing that he could not

escape by going ahead, instantly rang to stop and then to back, and blew two whistles, to indicate to the Favorita his wish that she should sheer to the left, while he endeavored, by a pressing signal to his engineer to "back her strong," to draw the Manhassett again into her slip. The signal, if heard, was not regarded and was not responded to; and the Favorita was, (if, after she was seen from the Manhassett, her course was at all changed,) sheered more to the right. A collision ensued. The Manhassett was struck just forward of her port wheel-house, and was greatly damaged. For this injury the libellants, her owners, brought this suit, and, by the decree of the district court,—The Favorita [Case No. 4,693],—both vessels were adjudged in fault, the Favorita in passing up the river on the right side, so near the Brooklyn shore, across the mouth of the libellants' and other ferry slips, and the Manhassett in not keeping her course, instead of stopping and backing, as she did.

There is some conflict of testimony on the question whether the Manhassett could, by continuing to advance, have cleared the steamship. The result of her advancing instead of stopping is, upon all the evidence, at least, doubtful. The pilot was acting in good faith, in a situation of great peril, and, an opinion formed after the event, which should pronounce his judgment erroneous, ought not to be decisive of fault on his part, casting upon the libellants the loss. It is a familiar and well settled rule, that, when a vessel is placed in imminent jeopardy by the fault of another, the discretion which her mariners are called upon instantly, and in the very jaws of the peril, to exercise, to effect deliverance, is not to be closely criticised, nor their conduct to be condemned, unless very plainly negligent or unskilful. Sudden danger and unavoidable alarm, in a degree, disqualify for the exercise of that calm weighing of chances, and a deliberate choice of the best possible mode of escape, which may, in other circumstances, be required; and if, therefore, I should conclude, that, had the Manhassett continued to advance into the river, she would have cleared the Favorita, (which I greatly doubt,) that would not be decisive. I think the case is clearly within the rule I have stated. The Favorita, coming at a speed of from eight to ten miles an hour, was almost upon her, before it was possible for the Manhassett to discover her approach. Advancing at from 600 to 800 feet in a minute, and hardly that distance removed when seen by the pilot, there was no time for deliberation, and, in my judgment, upon the whole case, no fault can be imputed to him, in what he did.

The whole fault was on the part of the Favorita, in putting the Manhassett in such peril. On that point, I deem it wholly unnecessary to rest the case upon any statute of the state of New York (Act April 12, 1848, Laws 1848, c. 321), or to affirm or deny the validity of that statute, in application to a case like the present. Nor do I hold here that ferry boats have any exclusive or prior right to which other vessels must yield. But, the exigencies of business, and the necessities of the public, and the resulting condition of a great thoroughfare like the East river, are to be recognized and respected by all who navigate its waters. The Favorita, or those in her management, knew or were bound to know this, and it ought to be accounted a gross fault to pass along the mouths of the numerous ferry-slips, in such proximity thereto as in the present case, when going at a speed at which all the efforts made to stop her, when danger of collision appeared, were ineffectual. The reasons upon which the statute requiring her to keep as near the middle of the river as possible is founded, are reasons of ordinary prudence and obviously tending to safety of navigation, whether the statute is or is not of binding force, as a statute.

Had the Favorita kept suitably distant from the shore, her speed was, no doubt, unobjectionable, and it is, therefore, her path, and not her speed, which condemns her; and, if any circumstances of convenience, whether the avoidance of other vessels, or the like, invited her to run near to the piers, she was bound to conform to the exigencies of that situation, and make her advance such as not to imperil other vessels pursuing their ordinary, accustomed, well known business, with which those in the management of the Favorita must be taken to have been familiar. This view of the fault of the Favorita is, I think, intensified by the fact, not before mentioned, that, when the Manhassett began to move out of her slip, when the Favorita could not be seen from the Manhassett, the smoke stack of the latter could be seen, and was seen, from the Favorita, moving out. There was then time for the Favorita to slow, stop, go out towards the centre of the river, or do whatever was requisite to avoid her, without involving her in the condition of danger from which she made her ineffectual endeavor to escape. I am constrained, by the convictions produced by the testimony, to hold that the consequences of this collision should be wholly borne by the Favorita.

In relation to the appellants' claim to be allowed a larger sum as damages, by reason of a depreciation in the value of the ferry boat, notwithstanding such repairs as were made, there ought to be no misapprehension of the rule governing this court. It aims at making the aggrieved party good for his loss, not by giving heed to speculative, fanciful or capricious estimates, but by clear and safe tests, which involve no danger of injustice to the party who is liable. The owner of the injured vessel may recover the cost of repairing her. If the cost of such repairs can be clearly and reliably shown, he may have such recovery, whether the repairs have

been actually made or not. He may repair his vessel fully, so that she shall be actually as good as she was before the injury, and be indemnified by his recovery. If his vessel be wholly lost, or so injured that she cannot be repaired except at a cost greater than her value, he may recover her value; and there may, possibly, be a case in which complete repairs cannot be made, in which intrinsic and inevitable diminution of value could be estimated safely and allowed. But that alleged depreciation in the market, which is said to result from the mere fact that a vessel has once been injured and repaired, depending upon prejudice or apprehension, when, in truth, the intrinsic value of the vessel is made good, is indefinite, uncertain and variable. The estimate thereof will depend upon the fears or caprices of proposed purchasers, and will fluctuate according to the fancy or imagination of witnesses.

In the present case, one thousand dollars was allowed for damages not fully repaired. The proof shows that it would cost at least that sum to make the repairs complete. This was properly allowed. There is testimony that the depreciation was greater, and that the vessel was not worth so much by two thousand dollars, and the libellants insist that two thousand dollars instead of one should have been allowed; but I think it clear, upon the whole testimony of the experienced ship builder by whom the estimate of two thousand dollars was made, that he has, in this, taken into view the effect upon the market value of the ferry boat, without confining himself to what it would cost to make her intrinsically as good as she was before. The allowance made must stand.

In regard to the allowance for the loss of the use of the ferry boat while undergoing repairs, I have in a former case (The Cayuga [Case No. 2,537]), expressed myself fully, to the effect that it is proper; and the circumstance that the libellants had a "spare boat," with which to perform her accustomed service, does not deprive them of the fair value of such use. To hold otherwise is, in effect, to hold that, when the defendants, in order that their ferry may be run without interruption, and, as they are doubtless bound to run it, that the public may be accommodated, provide, at large expense, more boats than are ordinarily required, this enures to the benefit of a tort-feasor, and he, on an estimate of damages, may claim, in effect, to be allowed the use of such surplus boats. They are provided, in part, with a view to just such interruptions, and with a knowledge that, in case of a wrongful injury to one boat, the libellants will legally obtain some compensation, at least, by way of indemnity for their expenditure.

The libellants must have a decree for the whole amount of the damages ascertained in the district court, with their costs.