## THE BRITANNIA.[1]

## THE BEACONSFIELD.

## CLEUGH *v.* THE BRITANNIA.

## LA COMPAGNIE FRANCAISE À VAPEUR *v.* THE BEACONSFIELD.

## COTTON *v.* THE BRITANNIA AND THE BEACONSFIELD.

*(District Court, S. D. New York. March 21, 1888.)*

1. COLLISION—BETWEEN STEAMERS—CROSSING STEAMERS—THWARTING MANEUVERS.

A crossing steamer, required by old rule 18 to keep out of the way of another vessel is bound at her peril to take into account all the circumstances, including both the speed and heading of the other. The latter has no right to thwart the former's maneuvers. A vessel's stopping is not "keeping her course," but is a violation of rule 23, and a fault, specially so after an agreement by signals, unless its necessity in order to avoid collision is reasonably certain. Till then the privileged vessel must rely on the other's performing her duty, and the burden of proving the necessity is on the former. Mere doubt and apprehension are not sufficient to justify a departure from the rules by the adoption of a thwarting maneuver.

2. SAME—PRIVILEGED VESSEL—CHANGE OF COURSE—SIGNALS.

Rule 23, in requiring the privileged vessel "to keep her course," is not designed to confer a favor or privilege, but to impose an obligation in order to enable the other vessel with certainty to keep out of the way. After the other's intention is known, or, an agreement by signals had, the former is bound upon any change thought necessary, to give notice of her intention by any available signals, either danger signals, under supervising inspectors' rule 3, or the short blasts provided by new article 19, when these would be certainly understood.

3. SAME—STATE STATUTES—ON WRONG SIDE OF CHANNEL—PROXIMATE CAUSE.

Where the statutes require vessels to keep on the right-hand side of the river channel, a colliding vessel will not be held in fault merely because she was in the wrong part of the river, if there was, nevertheless, ample time and space to avoid collision. Bad navigation is then deemed the only proximate cause. But in case of an unexpected crossing from the right to the wrong side of the river, which causes embarrassment to the other, or such reasonable apprehension of collision as leads to erroneous orders by the other vessel, whereby a collision is produced, the former's disobedience of the statute should be deemed a contributing and proximate cause, which renders her liable.

4. SAME—NEGLIGENCE.

The Beaconsfield, going out of the East river, came in collision off pier 1, in the northerly third of the channel, with the Britannia, which was turning up the East river. They exchanged signals of one whistle when two-thirds of a mile apart, and when the Britannia was just past Governor's island. Both understood that they were to pass port to port. The latter had to make a swing of about 6 points to starboard. Owing to the ebb tide and the high west wind, her swing to starboard during the first minute and a half was much delayed, whereupon the Beaconsfield, uncertain as to the other's eventual course, reversed when 1,500 feet distant, and came to a stop in the water without giving any signal to indicate her change of intent. The helm of the Britannia was all the time hard a-port, and she would have gone clear had the Beaconsfield kept on. Her swing to starboard was perceived directly after the

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

Beaconsfield reversed. As soon as the latter's stop was perceived, about 600 feet distant, the Britannia reversed full speed but too late to avoid collision. *Held*, that the Beaconsfield was in fault (1) for not keeping her course, but stopping without apparent necessity; (2) for giving no signal of her change of intention; (3) for not pursuing any firm or consistent course; (4) for lying still and doing nothing to avoid collision, for a minute and a half after she had stopped and the real danger was evident.

5. SAME.

*Held, further*, that the Britannia was in fault for coming within 100 yards of Governor's island, instead of going further to the westward, and for not shaping her course so as to make her turn within the right-hand side of mid-channel, where the state statutes required her to go.[1]


In Admiralty. Cross-libels for damages.

Cross-suits by the respective owners of the steam-ships Britannia and Beaconsfield to recover damages occasioned to the vessels by reason of collision. The third suit, that of Cotton, was brought by the owner of the cargo on board of the Beaconsfield, which vessel was sunk by the collision, against the Britannia alone, the Beaconsfield being made a party defendant by petition of the Britannia, under the fifty-ninth admiralty rule of the supreme court.

*Geo. A. Black*, for Clough and the Beaconsfield.

*Sidney Chubb*, for Cotton.

*R. D. Benedict*, for the Britannia.


BROWN, J. On the 19th of November, 1886, between 9 and 10 o'clock in the forenoon, as the English steam-ship Beaconsfield, outward bound from Dow's Stores, Brooklyn, was going out of the East river, she came in collision off pier 1, with the French steam-ship Britannia, bound up the East river. The Beaconsfield was 270 feet long, her gross tonnage 1,736 tons, and draft 21¾ feet. The Britannia was 337 feet long, her gross tonnage 2,442 tons, and draft 17 feet. The collision was at an angle of from five to seven points. The stem of the Britannia struck the port side of the Beaconsfield, a little aft of amid-ships, and penetrated about five feet, doing damages to both ships and cargo, amounting as alleged to $115,000.

The first two suits are cross-libels brought by the owners of the steam-ships to recover their respective damages, each alleging that the other was wholly in fault. The third libel was filed by the owners of the cargo to recover the sum of $45,000 damages against the Britannia alone. Upon her petition, under the fifty-ninth supreme court rule in admiralty, the Beaconsfield was brought in as a party defendant. The chief faults alleged against the Britannia are that she ran too near Governor's island, and attempted to make too short a turn into the East river; and that she did not stop and back in time, nor keep out of the way of the Beaconsfield, as she was bound to do. The Britannia alleges that she took all proper measures to keep out of the Beaconsfield's way, and would have done so, by going safely astern of her, had not the latter thwarted those measures by her own misconduct in unjustifiably stopping in the

[1] As to the effect of the screw on steering, see note, p. 555.

line of the Britannia's course, and thereby bringing about the collision. The two steamers first came within sight of each other when the Beaconsfield was a little to the eastward of pier 4, East river. The Britannia had then just come up past Fort William, on Governor's island. She had previously shaped her course to go near to Governor's island, and on approaching the fort she had come still further to the eastward in order to avoid a tug and tow which were coming down the river; and when a little to the westward or northward of the fort, and very near it, she grazed the bottom. The master testifies that his previous course had been about N. N. E., coming up under a slow bell, and that after starboarding (porting) to clear the tug, he resumed his former course; and that he was on that course when he touched bottom; that he then rang the bell to go full speed ahead until the Britannia had cleared the ground, and that he then again slowed, and put his wheel hard a-port to round into the East river; and that the wheel remained hard a-port until the collision. When the vessels were first visible, and were first seen, they were about two-thirds of a mile apart. Very shortly afterwards the Beaconsfield, when opposite pier 4, gave a signal of one whistle, and heard what she understood to be an answer of one whistle; but seeing the Britannia swing a little to port, as was thought, instead of to starboard, she repeated her signal of one whistle, from one to two minutes after the first, and reversed her engines. The wind was high from the west, and neither of the Beaconsfield's whistles were heard on the Britannia. The Britannia, however, gave three signals of one whistle each, the second and probably the third of which were heard upon the Beaconsfield. The pilots on both vessels understood the purpose of each to pass port to port, as the Britannia should turn around into the East river. The pilot and master of the latter say that she did not swing at all to port after their first signal, but swung all the time to starboard.

The tide was the last of the ebb, and the water lower than usual. There was, however, some current, estimated at the rate of about a knot an hour, which, as the Britannia drew above Fort William, struck her starboard bows and retarded somewhat her swing to starboard, under her port wheel. This was probably soon after one of the whistles of the Britannia had been heard on the Beaconsfield. The pilot and master of the latter, seeing that the Britannia was slow in changing her course to starboard, reversed, as above stated, when about 1,500 feet distant, and at the same time gave a second signal of one blast of the whistle. "Directly after the order to reverse," as the master testifies, "he saw that the Britannia was swinging more to starboard. She was then about four points on his port bow." The Beaconsfield's engines were, however, kept reversed until her motion in the water was nearly or quite stopped, running, as her master estimates, about two lengths, and occupying, as he thinks, about two minutes; and from that time till the collision, i. e., from one to two minutes more, she remained nearly still. When the Beaconsfield was seen to have stopped in the water, or nearly so, about five or six hundred feet distant, the Britannia's engines were reversed, and from that time they were kept reversed until the collision, when the

Britannia was nearly, but not quite, stopped. The high west wind neutralized the effect of slight ebb tide on the Beaconsfield's course. The estimates of the two masters as to the distance at which the Britannia reversed agree at 500 to 600 feet; and the engineer of the Beaconsfield says that after he had stopped reversing his engine he came out on deck and saw the Britannia about a length away. When the two vessels sighted each other, they were going at very moderate speed. Careful attention to the testimony of the engineers, and the number of revolutions of the engines, satisfies me that the two differed not more than about one or two knots in speed; the Beaconsfield going about four or four and one-half knots, and the Britannia from five to six. The full speed of the former was about nine to ten knots; of the latter, about ten or eleven. From the time each sighted the other to the collision was probably less than five minutes, though the aggregate of the estimates of the various intervals would exceed that. It is not probable that the Beaconsfield was backing over a minute or a minute and a half, running some 300 or 400 feet. The Britannia claims that by porting she took timely and sufficient measures to go to port of the Beaconsfield, and astern of her, and that no collision would have happened except for her unexpected and unjustifiable stopping, which brought her under the bows of the Britannia.

As respects the Beaconsfield the main controversy has been whether she was, under the circumstances, legally justified in stopping as she did. The Beaconsfield invokes rule 21, § 4233, Rev. St., which provides that "every steam-vessel, when approaching another vessel so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse." This rule does not require a vessel to stop or reverse unless (1) the vessel is approaching another so as to involve risk of collision; nor (2) unless stopping and reversing are necessary. The word "reverse," used in connection with the word "stop," shows that both words have reference to the engine, and that even stopping the engine is not required unless that be apparently necessary. The words "if necessary," as they stand in this rule, do not grammatically qualify the direction to "slacken speed." In article 18 of the new rules the words "if necessary" are transposed to the end of the sentence, presumably for the purpose of qualifying both the previous clauses; and as no reason is apparent why a vessel should be required to "slacken speed" when it is not necessary, or apparently necessary, to do so, the change of phraseology in the new rule might well be regarded as showing the intention of the former rule. That question is not involved here, as we have to do, not with slackening speed, but with stopping and reversing. The Britannia contends, however, not only that there was no "necessity" for stopping, but that there was no "risk of collision" till the Beaconsfield created that risk by her own misconduct in stopping her headway.

The evidence leaves no doubt in my mind that there was no actual "necessity" for stopping, and no actual "risk of collision" when the Beaconsfield reversed; and that had she kept a steady course, the Britannia, even without reversing or stopping her engines, would have passed her

track not less than two lengths astern, and possibly three. Had the Britannia not reversed when she was 500 or 600 feet distant, she would have occupied about one minute in reaching the place of collision, as the Beaconsfield was nearly or quite stopped; and during that interval, had the latter kept on at her previous speed of four or five knots, she must have been nearly two lengths to the westward at the moment of collision. Besides this, she lost nearly a length while slowing, before she stopped reversing. On this point my conclusion might have been different if I had found that the weight of testimony sustained the Britannia's contention that the collision was south of mid-channel; or so far to the south that the Britannia, on swinging her head to the westward, after the accident, (if in fact she did swing due west,) had the Diamond Reef buoy nearly astern, and on her starboard quarter. Not only is the weight of evidence, in my judgment, clearly opposed to so southerly a position, but I regard it as impossible for the Britannia upon the course of N. N. E. and passing very near Governor's island, to have turned up the East river in that wind and tide south of mid-channel; but if she could, she must, on turning, have crossed ahead of where the Beaconsfield would have been. In other words, the collision could not have happened in that way. See *Chamberlain* v. *Ward*, 21 How. 548, 562. The place of collision, I find, was most probably from 1,100 to 1,200 feet about S. W. by S. from the end of pier 1, or a little to the north-east of the figures 31, on the chart. This is about the position that would be reached by the Beaconsfield upon a course W. by N., passing, as her pilot finally said he passed, about 300 feet north of Diamond Reef buoy, and then porting a little. It accords with the testimony of the pilot of the Dentz, and also with that of the pilot of the Van Dyke, who came down some distance astern of the Beaconsfield, a little to the northward, as he said, of mid-channel, heading about W. ½ S., and having the Beaconsfield "a little on his port bow;" and it accords with the estimated distance of 500 feet to the southward of the Van Dyke after her stem had taken the ground. It seems probable that she grounded near the shallow spot marked 18 on the chart, from 500 to 600 feet S. W. by S. from pier 1. In that position her stern would extend a little to the eastward of that pier, as the proof shows it did.

The immediate cause of the collision I must therefore find to have been the Beaconsfield's reversing when the two vessels were about 1,500 feet apart. This maneuver thwarted the Britannia's efforts, and was not justifiable for the following reasons: In order to prevent the confusion and fatal results that would often arise from conflicting orders, if both vessels were to undertake the duty of avoiding each other, the rules of navigation impose upon one of them primarily the whole duty of taking active measures "to keep out of the way," and require the other "to keep her course." Old Rules, 19–23. The former is bound to shape her course with reference to all the circumstances. Good judgment and careful handling are often necessary to avert disaster. In selecting the mode of keeping out of the way, the speed of both vessels is as necessary to be taken into account as their courses. This is the

every-day practice of seamen. Safe navigation, especially in crowded harbors, would otherwise be impossible. As the vessel bound to keep out of the way must, therefore, at her peril, shape her course with reference to the speed as well as the heading of the other, the latter, after an agreement between them is had, or after the other's maneuvers are known, has no right to change either her direction or speed to the other's prejudice, while she is executing proper and sufficient maneuvers to keep out of the way, unless some circumstances exist that make such a change necessary. The vessel required to keep her course must do nothing to thwart the other. This general rule is well settled and constantly applied. It prohibits every unnecessary act or change that would embarrass or defeat the other's efforts. As between a steamer and a sailing vessel this general rule has been affirmed by the supreme court in the strongest language. In the case of *The Scotia*, 14 Wall. 170, 181, the supreme court say:

"The duty of the steamer (to keep out of the way) implies the correlative duty or obligation of the ship to keep her course, and to do nothing to mislead."

In *The Illinois*, 103 U. S. 299, the court say:

"But the sailing vessel is under just the same responsibility to keep her course, if she can, and not embarrass the steamer while passing by any new movement. The steamer has the right to rely on this as an imperative rule for a sailing vessel, and govern herself accordingly."

See, also, *The Free State*, 91 U. S. 200, 205; *The Adriatic*, 107 U. S. 512, 2 Sup. Ct. Rep. 355; Mars. Col. (2d Ed.) 414. These observations are ordinarily just as applicable to a steamer that is required to keep her course, as to a sailing vessel. The reasons are the same, and in my judgment rule 21 creates no exception in the case of steamers; certainly none as respects stopping and reversing, except where special circumstances make it "necessary." It is to be observed, first, that none of the rules are to be taken absolutely or independently of the rest. They are to be construed and applied together, and with reference to each other, and to their common design, viz., to prevent collision. *The Cayuga*, 14 Wall. 270, 276; *The Sunnyside*, 91 U. S. 208, 214, 218; *The Benares*, 9 Prob. Div. 16; *The Columbia*, 25 Fed. Rep. 844. Hence when observance of a rule would plainly tend to bring about a collision which departure from the rule would avoid, departure becomes a duty. The case, then, falls under the exception of rule 24. Articles 23 and 24 of the new regulations in like manner expressly recognize the duties arising from the ordinary practice of seamen, and from the special circumstances of the case. It is well settled that although the crossing rule (16) and the approaching rule (21) use the same words "so as to involve risk of collision," they do not come into operation contemporaneously. A vessel bound to keep out of the way, and crossing another's course "so as to involve risk of collision," if she adopt timely and sufficient measures for that purpose by the use of the helm, is not bound by rule 21 to slacken speed also. *The Jesmond*, L. R. 4 P. C. 1; *The Free State*, 1 Brown, Adm. 251, 268; 91 U. S. 200, 205; *The Beryl*, 9 Prob. Div. 137, 142. The other ves-

sel, in like manner, has a right to presume, and is bound to presume, that the former is performing her duty, until the contrary is reasonably certain. *The Free State*, 91 U. S. 204, and cases there cited. It is then only that she has a right or is bound to assume that there is risk of collision, and to stop and reverse, and thereby depart from her ordinary duty to keep her course. Mars. Col. (2d Ed.) 425, 426. The case is much stronger when the vessel bound to keep out of the way is perceived to be maneuvering for that purpose, or when a common understanding has been had, through the exchange of signals, as to her mode of doing so. It would make the rules practically contradictory if, after having come to a proper agreement as to the very mode of avoiding a collision, the privileged[1] vessel might straightway violate that agreement by making a contrary maneuver that tended to defeat the other in the performance of her duty, and was contrary to what the latter was bound to consider, and had a right to rely upon, in shaping her course. Under such an agreement, until it is reasonably certain that the vessel bound to keep out of the way cannot or will not do so, the duty of the privileged vessel to do nothing to thwart the other's efforts seems to me plainly controlling. The case is one in which, under rule 24, having regard to the dangers of a contrary course and the special circumstances of the agreement already had, a departure from rule 21 would be required, if the latter rule could be deemed applicable at all. FRY, L. J., in the case of *The Beryl*, page 145, observes that "article 18 (old rule 21) comes into operation from time to time whenever the circumstances existing at the time make it necessary that the article should be acted on." The remark of BRETT, M. R., in the case last cited, that "keeping her course * * * has nothing to do with the question of speed" was not necessary to the decision of the cause, and was not, I think, fully considered. I have found no such adjudications. On the contrary, the vessel required to keep her course has not unfrequently been held liable for backing while the other was maneuvering to avoid her. *The Favorita*, 1 Ben. 30; *The Northfield*, 4 Ben. 112. Although *The Favorita* was reversed on appeal, (8 Blatchf. 539,) it was only on the ground that the error was commited *in extremis*. The phrase "shall keep her course," in rule 22, must be construed in its ordinary nautical sense; and when a steamer stops and reverses until she is still in the water, she certainly does not "keep her course" in the nautical sense, or in any sense. She has then no "course" at all. If reversing is continued until she gets sternway, it is absurd to say that she still keeps the same course as when she was going ahead. If her heading remained unchanged, her "course" would be precisely opposite. It may, possibly, be an open question whether a material slackening of speed by the privileged vessel, when it tends to thwart the other, is "keeping her course" in the nautical sense, or permissible under rule 23. Under old rule 21, to stop still, as the Beaconsfield did, certainly is not. Under

---

[1] NOTE. I use the word "privileged" for the sake of brevity only. But the duty of one vessel to "keep her course" is not intended by the rules as a privilege conferred, but as an obligation imposed, in order to enable the other vessel with certainty to keep out of the way. Per BLATCHFORD, J., in *The Columbia*, 25 Fed. Rep. 845.

new article 18 I have no doubt that in such a case slackening speed is not permissible unless "necessary." Mars. Col. (2d Ed.) 415.

I feel bound to hold, therefore, that the Beaconsfield, in stopping her headway, broke rule 23, which required her, under the circumstances, to keep her course; that where a common understanding by signals has been had, and the vessel bound to keep out of the way is taking sufficient measures accordingly, as the Britannia in this case did, rule 23, and the implied legal obligation of the privileged vessel to do nothing to thwart the other, are controlling; and that rule 21 does not, in such a case, authorize stopping and reversing, unless special circumstances that subsequently appear make stopping and reversing necessary. A certain time is required and must be allowed for the execution of the maneuvers agreed upon, necessarily varying according to the circumstances. When the maneuver involves a swing from pointing ahead to going astern of the privileged vessel, considerable time is necessary. While the proper maneuver is pending, after an understanding by signals, the privileged vessel has no right to assume that the other vessel is not executing it properly, or that there is any risk of collision under rule 21. The agreement for the time being presumptively terminates the risk of collision, and rule 21 does not come into operation. *The Free State*, 91 U. S. 204; *The Clement*, 2 Curt. 368; *The Northfield*, 4 Ben. 117.

But it may be that after such an understanding by signals has been had, the movements of the vessel bound to keep out of the way may, in consequence of miscalculation, unforeseen circumstances, or fault, be so tardy, ineffectual, or contrary, as justly to renew apprehension of collision, in spite of the previous agreement for avoiding it. Such, it is claimed on the Beaconsfield's part, was the present case. It was by reason of the uncertainty of her officers as to the other's course, no doubt, that she was stopped and backed. Nor have I any doubt that under the circumstances, and in the apparent situation, this renewed apprehension was natural and reasonable. But I cannot hold that the circumstances were so urgent as to warrant a contrary maneuver that tended to defeat the agreement that was already made and presumptively in course of execution. The stop being, as I have said, under the circumstances, a violation of her obligation to "keep her course," the burden of proof is upon her to show its necessity, and that it was reasonably calculated to avert the danger; both because stopping was a departure from rule 23 of the statute, and because it tended to thwart the Britannia's efforts. Mars. Col. (2d Ed.) 413, 414, 431 and cases there cited. Even if there were no regulation providing for such a case, I should hold that mere doubt and apprehension are not enough to justify such a thwarting maneuver. This was emphatically stated by BLATCHFORD, J., in the case of *U. S. Grant*, 6 Ben. 465, 467. There must be a reasonable certainty that the vessel bound to keep out of the way is not doing her duty, and cannot or will not keep away in the manner agreed on, before the other vessel can be held authorized to violate the pending agreement and her legal obligation under it, and to take the matter into her own hands by executing a conflicting maneuver. If that were allowed, the rules would

have little or no value in the very cases where the observance of them is most needed; and all certainty as to the duty and responsibility of keeping away would be lost. The situation, doubtless, required firmness and nerve; but these qualities are indispensable in navigation. Sailing vessels are often put in the same doubt and uncertainty by steamers; but the rule that requires them to hold their course, and not execute a contrary maneuver, is never relaxed except when the peril is imminent. The rule and the tests applicable in reference to maneuvers that tend to defeat the other vessel's action are manifestly totally different from those that might tend to aid the other in avoiding collision. When one vessel is certainly crossing another's bows, and there is evident risk, the latter is bound to slacken or reverse, because that is apparently necessary, and cannot do harm; but where the former is known to be trying to go astern it is culpable in the other to reverse without a reasonable certainty of its necessity.

In this case, though there was reasonable doubt and uncertainty, through the Britannia's delay in swinging, and through her continued approach towards the north side of the river, where she had no right to come, yet when the Beaconsfield reversed, the case was far short of any reasonable or apparent certainty that the Britannia was not otherwise doing her duty, or could not avoid her by going astern as agreed on. The fact was quite the contrary. She was doing all she could. The time since the exchange of signals was short. Her officers say she did not swing to port at all after the signaling, but was swinging to starboard all the time. Their means of knowing were best. The Beaconsfield's pilot finally estimates the swing to port at half a point. I do not think he could distinguish a change so slight. The tide coming against the starboard bow first would, of course, make some delay. But that influence would continue for about a length only, or a little over half a minute. The high wind would make some additional delay in her swinging. The pilot of the Beaconsfield says that he expected and looked for that. "Seeing more of her broadside" was the natural result of the nearer approach. The agreement to go astern was understood. No subsequent signal to the contrary had been given by the Britannia, whereas such a signal must have been expected by the pilot of the Beaconsfield in case of any change of purpose by the Britannia; and the master and pilot do not say that they believed she had made any change of purpose. The agreement for her going astern was therefore still in full force. The Britannia was still at least a quarter of a mile distant in a direct line, and considerably more than that by the paths on which the vessels were approaching each other. She was at least four points on the Beaconsfield's port bow, and the pilot and master of the latter could not know how rapidly the Britannia could swing after the first effects of the wind and tide were overcome; nor were they charged with that responsibility. The reasons for stopping, given by the master and pilot, are stated in a loose and unsatisfactory manner. They do not say that they thought she was going ahead of them, nor even that they were uncertain which way she would go. But such uncertainty is, I think,

to be inferred; and I give them the benefit of that inference; their conduct is not consistent with anything beyond mere apprehension and uncertainty. These circumstances, with the facts which the subsequent events show, that if the Beaconsfield had kept on steadily, the Britannia would have crossed her path from 500 to 700 feet astern, satisfy me that there was no such reasonable or apparent certainty of collision, or any such apparent necessity, as alone would authorize the Beaconsfield to stop her course instead of keeping it; when stopping, if not certainly right, was sure to embarrass the Britannia, and likely to bring on collision. That her reversing was premature is confirmed by the fact that she came to a substantial stop within a little over half the time and space that separated them.

But the case does not rest upon the general rules of navigation only. Supervising inspectors' rule 3 provides for just such cases of doubt and uncertainty. The uncertainty, doubtless, was as to whether the Britannia would, after all, go astern, or ahead, or collide; *i. e.*, the doubt and uncertainty were as to her "course." Rule 3 in that case requires that the pilot, who is thus in doubt, "shall immediately signify the same by giving several short and rapid blasts of the steam whistle, and if the vessels shall have approached within half a mile of each other, both shall immediately be slowed to a speed barely sufficient for steerage way until the proper signals are given, answered, and understood, or until the vessels shall have passed each other."

It is plain that the pilot in this case did not observe this rule, nor act with any reference to it. He did not give several blasts of the whistle, but one blast only, *i. e.*, his original signal, which meant that he would pass ahead; and yet he stopped his boat, a maneuver directly contrary to the meaning of that signal, and ported his wheel, which, the master says, worked true while the steamer had headway.[1]

---

[1] It is often stated that upon reversing the screw the action of the rudder, even while the ship has headway, is, though feeble, the reverse of its normal action. See Mars. Col. (2d Ed.) 396, 397; Whit. Nav. Arch. 605. Masters usually testify in general terms to that effect; but few have made any actual experiment with their vessels, so as to testify with any exactness or certainty. Careful experiments made with The Aurania, 29 Fed. Rep. 99, 121, 122, showed that during the first minute after reversal the action of the helm was true and normal, though reduced. The same was deemed established in the case of The Ranger, L. R. 4 P. C. 519, 527. See The Nacoochee, 22 Fed. Rep. 855, 858. In this case it is noticeable that both masters testified that so long as their ship had headway the helm worked true. This is probably correct for only the early part of the period of reversing. When the engine is reversed, the race of water from the propeller runs forward; and the rudder blade, meeting less resistance from the water has less effect in swinging the ship's stern. When the ship's headway is so diminished, and the forward race so strong as to draw the water wholly away from the forward side of the rudder, its effect wholly ceases. How soon this happens after reversing depends in part upon the relative position of the rudder and the screw, and may therefore differ in different vessels, though probably not greatly. The effect of the screw upon the heading arises from the unequal lateral thrust of the propeller blades in the upper and in the lower half of the circle of revolution. When the vessel is light, and the blades come near the surface, so as to churn the water, the resistance of the water in the upper half of the revolution is materially less than in the lower half; so that there is a preponderance of resistance by the water below, that presses the stern opposite the direction of the lower half of the circle of revolution; *i. e.*, head to port, with a right-handed screw working ahead, and in the opposite direction when working astern: and with a left-handed screw, the reverse. When the steamer is well loaded, and the propeller deeply immersed at the top, the difference of resistance above and below is slight, and the propeller has then little effect on the heading.

He did not merely bring his vessel down to steerage-way, but stopped her. It is plain that inspectors' rule 3 was ignored. Again, common prudence demands that no thwarting maneuver by the vessel required to keep her course should be made contrary to a previous agreement or understanding with the other vessel, except upon notice to the latter of the intended new movement by any available signals, in order to prevent as far as possible misleading the other. Such signals were available here,— either the danger signals under inspectors' rule 3, or the three blasts, under new article 19, either of which would have been immediately understood. *The Martello, ante,* 71. It cannot be inferred that because the Beaconsfield's one blast was not heard, three or several would not have been heard or noticed. If heard, the Britannia would doubtless have reversed at once, as she did do as soon as she saw that the Beaconsfield had stopped; and this would have avoided the collision. And neither the inspectors' rules, nor any other rule, authorized her to "stop and reverse" unless apparently "necessary;" and that, as I have said, does not appear.

But if the order to reverse had been justifiable when given, the Beaconsfield was bound to act with consistency, and to adhere to her maneuver till she was out of danger; or if the order was found to be erroneous, to remedy the error by countermanding it and going ahead again as soon as possible. She did neither, but continued reversing for about one or two minutes, till she came to a substantial stop, right in the Britannia's path; and then lay still about a minute and a half more till struck, despite anything the Britannia could do. The master says that "directly after the order to reverse was given the Britannia was seen to be swinging more to starboard." He should therefore instantly have countermanded his order to reverse, or kept on reversing till out of danger. There was nothing in the way to prevent either, and either would have averted this disaster. After the vessel was stopped, and when the real danger became evident, he was, moreover, bound to do what he could to avoid it; but he lay still and did nothing. He neither went ahead nor backed, when either would have prevented collision. In this I think the Beaconsfield violated a duty that was reasonably obvious. Mars. Col. 425, 426. The Beaconsfield is therefore to blame (1) for not "keeping her course" as required by old rule 23, but thwarting the Britannia's efforts to avoid collision by backing without the justification of any rule or regulation, and without reasonable or apparent necessity; (2) for adopting this conflicting and dangerous maneuver, after an understanding to the contrary, without notice to the Britannia of her intended change; (3) for lack of any firm or consistent course on her part afterwards; and (4) for doing nothing to avoid collision during a considerable time after she had come to a stop, when the real danger became evident.

The Britannia. The evidence, in my judgment, does not establish any fault in the Britannia, after the first signals were exchanged, aside from her near approach to Governor's island, with her heading about N. N. E., and its effect on her subsequent course. It is clear that her way was nearly stopped when the vessels struck. Her officers testify, and

there is no reason to doubt their testimony in this respect, that they reversed as soon as the Beaconsfield was seen to be stopping, when about 150 or 160 meters distant, i. e., from 500 to 600 feet. In the high wind that prevailed from the westward, the fact that the Beaconsfield's whistles were not heard does not warrant my finding that proper attention was not given to her. The Britannia, so far as the evidence shows, gave the proper signals; made the proper maneuver by putting her wheel hard a-port at once. She would have gone from one to three lengths astern of the Beaconsfield except for the latter's fault in stopping her headway; and as soon as the Beaconsfield's stopping was visible, or the danger of collision discoverable, the Britannia reversed her engines full speed. That was all she could do. The rules required no more. *The Greenpoint*, 31 Fed. Rep. 231; *The Khedive*, 5 App. Cas. 876. In these latter respects there was no fault on her part. The amended libel of Cotton, however, sets up as a fault in the Britannia that in the ebb tide and the strong west wind she came up too near to Governor's island, and should have gone more to the westward, so as to head the tide and make an easier, i. e., a quicker, turn into the East river. The proof sustains the charge, and is not met by any sufficient justification. A statute of this state, passed April 12, 1848, (4 Edm. St. 60,) requires that the East river, from the battery to Blackwell's island "shall be navigated as near as possible in the center of the river." The Revised Statutes of this state (page 683) require steam-boats meeting on any waters within the jurisdiction of the state to go to starboard so as to pass each other with safety. Taking these provisions together, the Britannia was required to shape her course so as to be able to turn within the southerly side of mid-channel. She could easily have done so, notwithstanding the ebb tide and high west wind, had she come up at a reasonable and proper distance to the westward of Governor's island, or shaped her course properly below it. But passing within 100 yards of Fort William, and heading about N. N. E., she could not help running a considerable distance into the northerly side of the channel, where, as I find, the collision occurred, and where she was forbidden to go. Neither of these statutes has any sanction annexed to it. It is not declared that any vessel going in the wrong part of the river shall be deemed in fault so as to be held responsible, wholly or in part, for every collision she may incur there, without reference to any other fault on her part. In this respect these statutes differ from the British act of 1873. *The Khedive*, 5 App. Cas. 876. Aside from some special provisions making the non-observance of the statute in itself a ground of liability, as in the British act above referred to, the mere transgression of such a statute will not make the vessel liable where the disobedience of it did not contribute to the collision. And inasmuch as only the proximate causes of collision are deemed material, the mere fact that a vessel is on the wrong side of the river does not make her liable, if there was ample time and space for the vessels to avoid each other by the use of ordinary care. In such cases the cause of the collision is deemed, not the simple presence of the vessel in one part of the river rather than in another part, but the bad nav-

igation of the vessel, that, having ample time and space, might easily have avoided collision but did not do so. *The F. M. Wilson*, 7 Ben. 367; *The Fanita*, 8 Ben. 11; *The Delaware*, 6 Fed. Rep. 195; *The E. A. Packer,* 20 Fed. Rep. 329. This general principle has often been affirmed by the supreme court. In the case of *The Dexter*, 23 Wall. 69, 76, it is said:

"It is not necessary to consider what was done by the respective vessels when they were some distance from each other; as it is clear they had ample time and opportunity to adopt every needful precaution to avoid the collision after it must have been apparent to both that they were fast approaching each other from opposite directions."

The same question was elaborately considered in the house of lords in the case of *Cayzer* v. *Carron Co.*, 9 App. Cas. 873, where it appeared that the steamer Clan Sinclair, by not easing her engines as early as she should have eased them, in rounding a bend in the Thames, where vessels were not intended to meet, had come into collision with another steamer, and it was held, reversing the court of appeal, that she was not liable; because the two were seen by each other in ample time to avoid collision by ordinary care; and the proximate cause of the collision was held to be the reckless attempt of the other steamer to pass where there was not room for her to go. See *The Nereus*, 23 Fed. Rep. 457. But where sailing in a part of the river prohibited by statute, or forbidden by reasonable prudence, prevents the vessels from being seen in time, or causes unreasonable obstruction or embarrassment in the performance of their respective duties, or in any other way actively contributes to the collision, the violation of the statute or regulation becomes material, and the offending vessel is responsible. *The Favorita*, 1 Ben. 30, 39, 8 Blatchf. 539; *The Maryland*, 19 Fed. Rep. 551, 556; *The Sam Rotan*, 20 Fed. Rep. 333; *The Doris Eckhoff*, 32 Fed. Rep. 556; *The Yourri*, 10 App. Cas. 276. In the case of *The Dentz*, 26 Fed. Rep. 40, 29 Fed. Rep. 525, in which the tug Dentz with three canal boats lashed alongside in passing through Hell Gate had, by her whistles, assented to the Plymouth Rock's passing on the port side of her in going through Hell Gate, where the inspectors' rules prohibited two boats passing, and a collision ensued, this court held the Dentz in fault for assenting to dangerous navigation in violation of the inspectors' regulation, and in part responsible for the collision; because, having given that assent, she did not go to the starboard side of mid-channel, which was unobstructed, so as to give the Plymouth Rock sufficient room for her necessary turn in that dangerous passage. In the circuit court this view of the maritime fault of the Dentz, in assenting to the violation of the regulation, "was fully approved;" but the Dentz was absolved from responsibility, because, upon the facts, it was held that the collision was brought about by the haste and recklessness of the Plymouth Rock; and that the latter did have "sufficient room on the port side" without requiring the Dentz with her three other boats alongside to leave the mid-channel. The duty of the Dentz, under the circumstances, to give the Plymouth Rock "suffi-

cient room on the port side of the channel to execute her maneuvers" was recognized. The court further say, page 528:

"When it appears that the Dentz has violated a rule which it was her duty to observe, she must assume the burden to show not only that it did not probably contribute to the disaster, but that it certainly did not."

That rule is applicable in this case to the Beaconsfield and the Britannia alike. This case differs from those in which the faulty situation of one of the vessels was held to be immaterial, in this respect; that in those cases the faulty situation existed at the beginning, and was fully known. The duties of each had reference to the known situation. Here the Britannia was at first on the proper side of the river, and the pilot of the Beaconsfield is not chargeable with knowledge that with her position and heading she could not round within the southerly half of the river where she was required by law to go. He could not tell exactly what her heading was, or how quick she could turn. He had a right to rely on her keeping on the southerly half of the channel; and as he was on the northerly side, there would in that case be abundant clearance. But it soon appeared that the Britannia could not keep within the south half. She had to turn some five or six points. Her continued approach towards the north half of the channel, with no perceptible turn, and still pointing ahead of the Beaconsfield raised reasonable apprehension and doubt as to her eventual course; and this apprehension led to the faulty orders that brought about the collision. It was the original fault of the Britannia in coming too near Governor's island, and in not shaping her course properly, so as to head the East-river tide sufficiently to enable her to observe both the statute and the obligations of reasonable prudence, in view of the many vessels constantly coming down past the battery in the northerly half of the channel, that caused the uncertainty and apprehension of the Beaconsfield's officers, and thus led to the collision. It was not the immediate cause of collision; but, as it seems to me, it was a direct, contributing cause. Again, it has often been held that a vessel bound to keep out of another's way is bound to do so by a reasonable margin, so as not to excite undue apprehension of danger. Where one vessel is put in very great and imminent peril through another's fault, by not allowing such a margin for safety as might and ought to have been given her, the whole blame is put upon the latter for her fault in bringing the other into such peril; though the collision may have been immediately caused by an error committed by the latter. These are cases *in extremis*. *The Favorita*, 8 Blatchf. 539; *The Columbia*, 9 Ben. 254, 258; *The Laura V. Rose*, 28 Fed. Rep. 104, 109.

This is not a case of error committed through fear *in extremis*. But the same principle, as it seems to me, must be recognized as applicable in some measure, where the apprehension of danger, though not amounting to a legal justification, has in fact directly led to the collision; and where that apprehension has been caused, as in this case, by a maritime fault of the vessel bound to keep out of the way, in her unexpected and near approach to the other vessel, in a part of the river where the former was forbidden to go and was not expected to come. In such a case the

violation of the statute seems to me to be one of the active and proximate causes of the collision.    When the whistles were first given, the precise path of the Britannia could not be foreseen.    As I trace it, had both kept on they would in fact have run within less than 100 feet of each other as they passed angling port to port, though the Beaconsfield's course would not be crossed till she was two lengths distant.    That is very near for so large vessels, when one of them is making a swinging course. It was not a reasonably safe margin for a turning vessel bound to keep out of the way.    It was just sufficient to pass if no error were committed by either; but it was only barely sufficient.    It was not "ample room," in the sense of not necessarily exciting just apprehension in the other vessel.    The doubt and apprehension of the Beaconsfield were, as I have said, natural and reasonable; and although she acted, as I have found, prematurely, and without that reasonable firmness and consistency and observance of the rules that the situation demanded, for which she, too, is held in fault; yet none the less, as it appears to me, was her fault directly induced through a reasonable and strong apprehension of danger caused by the Britannia's approach to the north half of the river, where she had no right to be.    The Britannia had no right to encroach on the water that belonged to outgoing vessels; nor, through disobedience of the statute, to run upon so narrow a margin, and thereby put outgoing vessels in the north half of the river under such stress of apprehension of collision, from which the statute was in part designed to exempt them.    In the case of *Cayzer* v. *Carron Co.*, *supra*, Lord WATSON says:

"If that conduct on the part of the Clan Sinclair (getting further down the Thames than she ought to have been) had been such as to place the Margaret at this disadvantage, to throw her into difficulties, and make it doubtful what course she ought to pursue, then I could hardly have excused the Clan Sinclair from contribution to the collision in the present case."

In the subsequent case of *The Yourri*, 10 App. Cas. 276, where that vessel was improperly going down river on the left-hand side, in the night-time, when there was "a certain degree of mist," and there collided with the Spearman coming up without any lights, both were held to blame.    The fault of the Yourri it was said "could hardly admit of dispute."    The circumstances I have mentioned, seem to me, in the language of Mr. Justice NELSON, in *Cramer* v. *Allen*, 5 Blatchf. 250, to "bring the case within the reason of the rule of apportionment."    I am satisfied, moreover, that the construction above given is in the interests of safe navigation about the Battery; that it is practically necessary, in order to insure a due observance of the statute, and the avoidance of collisions; and that the contrary rule would leave the statute without effect where its application is most specially needed.

I do not find it necessary to refer to the other questions discussed in the argument.    Decrees may be entered in accordance herewith, with a reference to compute the damages.