THE AMOS C. BARSTOW.

THE JAMES A. GARFIELD.

McCALDIN *v.* THE AMOS C. BARSTOW.

ROBIN *v.* THE JAMES A. GARFIELD AND THE AMOS C. BARSTOW.

*In re* McCALDIN.

*(District Court, S. D. New York. May 13, 1892.)*

**1. COLLISION—STEAM VESSELS—ATTEMPT TO CROSS BOWS—RECKLESS NAVIGATION.**
The tug G. undertook with a signal of two whistles to cross the bows of the large steamer B., off pier 3, East river, when the steamer was only 400 feet distant, and a strong current was setting the tug towards her, and the position of the steamer was such that the pilot of the tug could not judge with any accuracy of the steamer's speed. Within 30 seconds collision occurred, the G. was sunk, and two men drowned. *Held,* that the G. was in fault for reckless navigation, though the steamer, *in extremis,* had answered with two whistles.

**2. SAME—EAST RIVER NAVIGATION—ROUNDING THE BATTERY—EXCESSIVE SPEED—STATE STATUTE—PROXIMATE CAUSE.**
The B. rounded the Battery, and entered the East river 600 or 700 feet from the ends of the piers, at a speed of ten knots through the water, and at least 7 knots against the tide, and collided with and sank a tug off pier 3. The vessels were not seen by each other until only 400 feet apart. *Held,* that the B. was in fault for going at such high speed so near the piers, in violation of the state statute, which required her to go "as near mid-river as possible," and that the disregard of the statute was a material and proximate cause of the collision.

In Admiralty. Libels for collision, and for personal injuries caused thereby. Petition to limit liability.

*Carpenter & Mosher,* for petitioner and the James A. Garfield.

*Goodrich, Deady & Goodrich,* for Henry Robin.

*Miller, Peckman & Dixon,* for the Amos C. Barstow.

BROWN, District Judge. The above libels grew out of a collision between the tug James A. Garfield and the propeller Amos C. Barstow, which happened a little after 3 o'clock in the afternoon of October 17, 1890, off pier 3, East river. The Garfield had started from outside of four boats moored at the end of pier 4, in the strength of the ebb tide, to carry the libelant Robin and another passenger across the East river to Prentiss' Stores, Brooklyn. When headed upon her course and about 275 feet off from the end of pier 4, seeing the propeller Barstow off the South Ferry slip coming up the East river, the Garfield gave her a signal of two whistles, indicating that she wished to go ahead of the propeller. The propeller was then not more than 400 feet below the Garfield and from 300 to 400 feet further than the Garfield from the New York shore, and heading up parallel therewith. The Barstow shortly before had given a signal of two whistles to an Annex ferryboat, which was about off pier 4, coming down river from 300 to 400 feet outside of the Barstow. Getting no answer from the ferryboat, the Barstow was about to repeat her signal when the signal of the Garfield was heard. This was the first that the Barstow had noticed of the Garfield. She immediately

answered the Garfield with two whistles, because, as her master testifies, he did not wish to create confusion by contradicting when the two vessels were so near each other. At the same time, he testifies, he put his wheel hard astarboard, stopped his engine, and backed strong. But the Garfield in crossing the strong ebb tide, sagged down upon the Barstow; and as her starboard side came in collision with the Barstow's stem, she rolled over to port and capsized, under the stress of the tide and the Barstow's headway, and swinging round to the southward of the Barstow, sank almost immediately. This all happened within about 30 seconds after the signals were exchanged. The next day the Garfield was found at the bottom of the river in 35 feet of water at a point about 750 feet directly south of pier 2, having floated probably about 150 feet downward and outward while sinking. The fireman and one of the passengers were drowned; and the libelant Robin sustained personal injuries, for which his libel was filed. The owners of the Garfield claim damages against the Barstow in the sum of $4,800; and they also filed a petition to limit their liability to the value of the Garfield, in case it should be found that the Garfield was in fault. The several cases, as respects the fault of either vessel, have been heard together.

The evidence shows that the Barstow before she reversed was going at the rate of 10 knots, and making at least seven knots against the tide; and that the Garfield was going about 7 knots across the tide. The captain of the Barstow estimates the strength of the ebb at about 4 knots; but this estimate is unwarranted. No circumstances are stated showing that the tide was more rapid than usual; and no doubt it did not exceed 3 knots, the maximum as ascertained by the government surveys.

1. Upon the above facts the Garfield was in fault. She had the Barstow on her starboard hand upon a crossing course, and was, therefore, bound by the nineteenth rule to keep out of the Barstow's way. The Garfield undertook to do so by crossing the bows of the Barstow under a signal of two whistles, when the latter was only about 400 feet distant, and a strong ebb current was setting towards her. Some witnesses for the Garfield testify that at the time the whistles were exchanged, the Barstow was pointing directly towards the Garfield; that the Barstow subsequently turned to starboard, and thus brought about the collision. But other evidence shows that this theory is incorrect. It is not only improbable in the highest degree that the Barstow should have ported her wheel contrary to the signals just given, but specially so considering the fact that an Annex ferryboat was at that time near meeting and passing the Barstow on her starboard side. The direct evidence of the Barstow is also to the contrary, and shows that there was no turn of the Barstow's bow to starboard, except such as might have been unavoidably caused by reversing her engines; and any change in her position to starboard from that cause must have been slight, and not a fault. Had the Barstow been pointing directly for the Garfield at the time the whistles were exchanged, she must have been heading considerably towards the New York shore, instead of directly up river, as all the other witnesses state; and the Garfield, moreover, must in that case have

crossed her course and been well out of the way before the Barstow could have reached her, so that on that theory no collision could have happened. I have no doubt that the Barstow, when the whistles were exchanged, was pointing directly up river, as almost all the witnesses say, and on a line from 300 to 400 feet outside of the Garfield.

The Garfield's attempt to cross the bows of the Barstow when so near, and in the way she attempted it, and in such a tide, was a dangerous and foolhardy attempt. The position of the Barstow was such that the pilot of the Garfield could not see or judge with any accuracy what the Barstow's speed was, and he seems to have mistaken her heading to some extent. He calculated by guess, because there was neither time nor room for the necessary observation. He missed, and in 30 seconds two lives were sacrificed. This is reckless navigation. The assenting whistle of the Barstow, given *in extremis*, in no way excuses it, or relieves the Garfield from responsibility. *The Dentz*, 29 Fed. Rep. 525; *The Greenpoint*, 31 Fed. Rep. 231, affirmed on appeal.

2. The Barstow was equally in fault for navigating around the Battery at such speed, and so near the shore, in violation of the statute, which required her to go in mid-river " as near as possible." There was nothing to prevent her from observing the statute, as vessels of her class and speed ordinarily observe it. She was not incumbered; and in going around the Battery near the New York shore, where so many boats are going in and coming out, she had not in her favor those economic excuses which tugs heavily incumbered with tows may present, in seeking the advantages that nature offers for economic navigation in the slacker water near the shore. Even these must take the risk of being held in fault. *The Columbia*, 8 Fed. Rep. 716, 718. But the danger from vessels like the Barstow, going at a speed of ten knots, and making at least seven knots against the tide, is very much greater than from incumbered tugs which make but one or two knots headway. And it was this high and unknown speed near the shore that made the Garfield's calculation fatally wrong.

Nor can it be claimed that the position of the Barstow was in this case immaterial, and not a proximate cause contributing to the collision. It was the very fact of her close proximity to the shore under such speed that prevented timely notice of her presence, and sufficient space and time for any proper or correct observation from the Garfield. The excuse of the Barstow for her assenting whistles, that the vessels were too near to admit of contradictory whistles, is itself a proof of the extremity of the situation when they first became visible to each other. There is no evidence that they were not seen as soon as visible to each other. Other vessels were between them, which probably delayed somewhat seeing each other as soon as they might otherwise have been seen. But the Barstow in going near the shore contrary to the statute, took all the risk of such usual obstructions. The purpose of the statute is to prevent all these risks, and to give time and space for the observation and judgment necessary for safe navigation, by requiring vessels to keep away from the shore and " as near as possible in mid-river."

4 Edm. St. 60.   Independent of the statute, safe and prudent navigation requires the same thing, as was held by Judge BETTS in the case of *The Relief*, Olcott, 104, 108, 109, which case, it is said, led to the passage of the statute.   The same view was expressed by WOODRUFF, J., in *The Favorita*, 8 Blatchf. 539, 540.

In the case of *The Bay State*, 3 Blatchf. 48, Mr. Justice NELSON said that this "state statute ought to be strictly enforced."   There the Worcester being "out of the track prescribed by law" in going up the East river near the New York shore, and being obliged to avoid a tug and schooner that she met, sheered to the right, and so ran into the Bay State, and was held solely to blame.   The same rule was reaffirmed in *The E. C. Scranton*, 3 Blatchf. 53, and in *The Favorita, supra;* and these cases have been followed in numerous others, where the false position has produced embarrassment, or prevented the vessels from seeing each other in ample time for correct observation, or for appreciating and making the proper maneuvers.   *The Maryland*, 19 Fed. Rep. 551, 556; *The Columbia*, 29 Fed. Rep. 716; *The Garden City*, 38 Fed. Rep. 860, 862; *The Britannia*, 34 Fed. Rep. 558; *The Yourri*, 10 App. Cas. 276; *The Rockaway*, 38 Fed. Rep. 856, affirmed 43 Fed. Rep. 544; *The Intrepid*, 48 Fed. Rep. 330; *The C. R. Stone*, 49 Fed. Rep. 475; *The Clara*, Id. 765.

The fact that the Garfield might have avoided collision by going more to port, does not lessen the fault of the Barstow.   The necessity of that course was not then perceived by the Garfield; and it was not perceived partly because the position of the Barstow was such that the Garfield had not time and opportunity to observe the necessity of it, as she would have had if the Barstow had obeyed the statute.   The position and high speed of the Barstow in rounding the turn of the Battery brought the vessels into very certain danger from the moment they were seen by each other.   When first seen they in fact were almost in the jaws of collision.   The master of the Barstow, aware of his own speed, saw and appreciated the danger; but there was neither time nor space for the maneuvers necessary to avoid accident; and this was due in part to his false position and high speed.   Near the shore rounding a bend very moderate speed was required.   *The Komuk*, 50 Fed. Rep. 618, (May 7, 1892;) *The Edgar F. Luckenbach*, 8 U. S. App. 9, 50 Fed. Rep. 129.

The fatal result in this case only emphasizes once more the necessity of observing not merely one rule, but all the cumulative rules designed for the avoidance of collisions.   *The Clara*, 49 Fed. Rep. 767. To excuse the Barstow in this case would be in effect to nullify the statute in its essential purpose, to encourage fast and dangerous navigation near the shore, and to multiply fatal catastrophes.   As the Barstow should be held liable upon this ground, it is not necessary to consider the contradictory evidence bearing upon the question whether she instantly reversed, or not.

Decrees may be entered accordingly, with **an order of reference to** compute the damages if not agreed upon.