## THE BRITANNIA.[1]

### THE BEACONSFIELD.

### CLEUGH v. THE BRITANNIA.

### COMPAGNIE FRANCAISE DE NAVIGATION A VAPEUR *et al.* v. THE BEACONSFIELD.

### COTTON *et al.* v. THE BRITANNIA *et al.*

*(Circuit Court, S. D. New York. March 7, 1890.)*

COLLISION—CROSSING STEAMERS—STOPPING INSTEAD OF HOLDING COURSE.

The Britannia and the Beaconsfield exchanged signals to pass port to port. When about half a mile apart, the former touched bottom, and, to avoid grounding, went straight ahead at full speed for about half a minute, and passed some 600 feet of deep water without turning into it. Her swing to starboard was then retarded by the ebb-tide and west wind, though her helm was put hard a-port, and for a brief space she made a slight swing to the westward. The Beaconsfield, being retarded by tide and wind, was going much slower than the Britannia. When four or five lengths apart, the movements of the Britannia at that time not indicating that she was porting, the Beaconsfield blew a single whistle, and, hearing no answer, reversed, the danger of collision continuing. Shortly after she reversed, the Britannia commenced to swing to starboard, and apparently they would not have collided had the Beaconsfield continued. Her pilot testified that there was a reef of rocks, which made it dangerous for her to continue in her course. *Held*, that the Beaconsfield was without fault, and the Britannia was liable for the loss of her and her cargo.

In Admiralty. On appeal from district court. 34 Fed. Rep. 546.

#### FINDINGS OF FACT.

*First.* On the 19th of November, 1886, about 10 o'clock A. M., a collision occurred in the harbor of New York, at the mouth of the East river, between the steam-ships Britannia and Beaconsfield, by which the Beaconsfield was shortly afterwards sunk.

[1] Reversing 34 Fed. Rep. 546.

*Second.* The Beaconsfield was a British iron steam-ship, 270 feet long, 34 feet wide, and 24½ feet deep. Her gross tonnage was 1,736 tons, and her draught at the time of collision was 21 feet 6 inches aft, and 21 feet 7½ inches forward. She was bound for Aberdeen, with a full cargo of grain.

*Third.* The Britannia was a French iron steam-ship, 337 feet long, 40 feet broad, and 27 feet deep. Her gross tonnage was 2,422 tons, and her draught at the time of collision was 17 feet aft, and 15 to 15½ feet forward. She was coming from sea, bound to her dock at Prentice's stores, on the Brooklyn side of the East river.

*Fourth.* On the morning in question the day was fine and clear, the wind was from the west, and blowing about 22 miles an hour. The tide in the East river was the last of the ebb, and the water was lower than usual. The ebb was still running very slightly in the East river, but was running strong in the North river; the effect, of which condition of the wind and tides was (and under like circumstances always is) to form a flood eddy on the north side of the channel, between the Battery and Governor's island, and an ebb-tide on the south side of the channel. These tides operate to turn the head of a vessel attempting to enter the East river near Castle William (on Governor's island) to the westward, as she crosses the ebb, until she enters the flood eddy. Thereupon her head is turned to the eastward. Such tidal action was within the knowledge of the pilot of the Beaconsfield, and should have been within the knowledge of the pilot of the Britannia.

*Fifth.* The Beaconsfield left Dow's stores next south of Atlantic-Avenue ferry, in Brooklyn, where she lay head in, at about 9:15 A. M., and was backed out, and, with the assistance of a tug, headed around to the northward, and when past the shoals was turned into the East river. When about midway between Diamond reef and the New York piers she saw the Britannia as the latter came clear of Castle William, and blew a single whistle to her. The Beaconsfield was then heading about W. N. W. or W. by N. The full speed of the Beaconsfield is between 9 and 10 knots, with 56 revolutions. At this time her engines were moving under an "easy ahead," with 30 revolutions, which would make her speed through the water about 5 knots. The retardation due to the action of the wind and to that of the flood eddy (described in the fourth finding) gradually reduced her speed over the ground, as she came within the influence of the eddy, to considerably less than 4 knots.

*Sixth.* The Britannia came up from the lower bay, in the channel between Governor's island and Bedloe's island, keeping well over to the eastward, on a course about N. N. E. When a short distance below Castle William, her wheel was ported, to enable her to pass under the stern of a tug and scow, which came out of the East river and crossed her bow. This gave her a change to starboard of about two points. As soon as she cleared the scow and tug she came partly back to her course, probably to about N. E. by N. or N. E. by N. ½ N., and shortly thereafter touched bottom near to Governor's island, and at about that point off Castle William where the 18-foot curve approaches nearest to the 24-

foot curve, being near the outer end of the projection formed by the 18-foot curve.

*Seventh.* The full speed of the Britannia is 10 to 11 knots, with 48 to 50 revolutions of her screw per minute; half speed, 7 to 8 knots, with 40 revolutions; and slow, 4½ to 5 knots, with 30 revolutions. As she came up past Bedloe's island she went about half speed. As she hauled to starboard to pass the tug and scow, her speed was reduced to slow, and so continued until she touched bottom. At about the time of touching she sighted the Beaconsfield on her starboard bow.

*Eighth.* In order to avoid grounding, the order was at once given on the Britannia to go ahead full speed, and was promptly obeyed. The helm at that time was about amid-ships. While getting clear of the bottom, and with her engines full speed, she blew a single whistle to the Beaconsfield. The whistle of the Beaconsfield referred to in the fifth finding was neither heard nor seen on the Britannia, but the latter's whistle, given while getting clear of the bottom, was heard on the Beaconsfield, and taken to be an answer to her own signal. At the time the Britannia thus signaled, the distance between the steamers was not quite half a mile.

*Ninth.* After clearing the bottom, the Britannia ported and hard a-ported her helm, but her bow, while in the ebb-tide near Governor's island, did not swing to starboard, but, on the contrary, did for a brief space take a slight but perceptible swing to the westward. Her helm was not changed from hard a-port until the collision. Her engines ran at full speed while clearing the bottom for about half a minute, and were then reduced to slow ahead. She only scraped the bottom. It did not hold her.

*Tenth.* When the Beaconsfield blew her first whistle her wheel was put to port a little, and kept steady a-port; and under her slow engine she drew ahead, her head inclining a little towards the New York docks. A careful watch was kept on the movements of the Britannia, and it was observed not only that she did not swing to starboard, but also that she was showing a little more of her starboard side to the Beaconsfield. Thereupon those upon the Beaconsfield, while still about four lengths from the Britannia, blew another single whistle, and, hearing no answer, put their wheel hard a-port, and stopped, and reversed full speed. Her engines were kept reversed until her headway was stopped. Then her engines were stopped, and at the time of the collision she was nearly, if not quite, dead in the water.

*Eleventh.* At the time the Beaconsfield reversed she had approached so near the New York shore that in view of her draught of water, and the condition of the bottom in that locality, there was some risk of her running aground, should she continue her headway much longer under her port helm. At that time the Britannia, not yet swinging to the eastward, was heading so as to cross the bows of the Beaconsfield, had advanced over a considerable part of the distance which separated them when she blew her first whistle, and was manifestly coming into the northerly part of the channel.

*Twelfth.* The second whistle from the Beaconsfield was not heard on the Britannia. The latter also blew a second single whistle, and thereafter a third, neither of which was heard or seen on the Beaconsfield.

*Thirteenth.* Shortly after the Beaconsfield began reversing, the Britannia commenced to swing to starboard, a motion which was perceived on the Beaconsfield.

*Fourteenth.* The captain of the Britannia had noticed that she did not swing as promptly as he expected after clearing the bottom, and after she did begin to swing he saw that she needed to come more to starboard, and that the ships, for some reason, did not get clear of each other, and, differing from the pilot as to the chance of clearing the Beaconsfield if he kept on, he gave the order to reverse his engines. Thereafter he let go his port anchor when about 100 feet from the Beaconsfield.

*Fifteenth.* The reversal of the Beaconsfield's engines occupied but a short time, during which she ran about a length. The order for the reversal of the Britannia was given before her master saw that the Beaconsfield had stopped. When the Beaconsfield stopped backing, the Britannia was about two of her lengths away, pointing about for the port bow of the Beaconsfield, and swinging to starboard.

*Sixteenth.* After her headway was stopped, the Beaconsfield took no further action, and lay still in the water until struck. The time from such stopping of her headway until the collision, during which she lay still, was about a minute and a half.

*Seventeenth.* The effect of reversing the engines of the Britannia was to reduce her speed so much that at the moment of collision her headway was almost stopped.

*Eighteenth.* At the time of collision the heading of the Beaconsfield was about W. N. W., and of the Britannia about N. E. by E.

*Nineteenth.* The place of the blow on the Beaconsfield was about ten feet aft of amid-ships. The Britannia cut through the port sides of the vessel, and cut into her coal bunkers, through her iron decks and stringer plates five feet on deck, and through her side plating up and down about 15 feet.

*Twentieth.* The place of collision was about on a line between pier 1, East river, and the place where the Britannia touched bottom, and in the northerly part of the channel. (About W. N. W. of the figs. 27 on the chart.)

*Twenty-First.* If the Beaconsfield had not stopped and backed, it is probable that the Britannia would have passed under her stern, a short distance astern of her.

*Twenty-Second.* There is no usage or habit or custom of the port which requires vessels coming into the East river from the lower bay to keep to the south of mid-channel.

*Twenty-Third.* The navigation of the Beaconsfield was in charge of an experienced and competent Sandy Hook pilot, who was on her bridge, where was also her master, who was a competent and careful navigator. At the wheel of the Beaconsfield were two seamen and her second mate; and on the lookout on her topgallant forecastle was her first officer; and

her engine was worked by her second engineer, the first engineer being on the top platform, in general charge,—all were competent and attentive.

*Twenty-Fourth.* At the time these steamers sighted each other and signaled, they were crossing so as to involve risk of collision, within the meaning of the nineteenth rule, and the Britannia had the Beaconsfield on her starboard side.

*Twenty-Fifth.* At the time when the Beaconsfield stopped and reversed, the vessels were approaching each other so as to involve risk of collision, A prudent navigator, viewing the situation at that moment from the deck of the Beaconsfield, would have reached the conclusion that, if neither the course of the Britannia were altered nor her headway checked, collision was imminent and inevitable, unless avoided by some change in the movements of the Beaconsfield.

*Twenty-Sixth.* The Britannia's movements, visible to the Beaconsfield, were not in accordance with the single whistle she had blown, and were such as created a natural, reasonable, and strong apprehension of collision in those in charge of the Beaconsfield, and they were thereby justified in taking the statutory precaution to avoid risk of collision, which is prescribed by the twenty-first rule for a steam-vessel approaching another vessel so as to involve risk of collision.

*Twenty-Seventh.* The Britannia did not keep out of the way of the Beaconsfield.

*Twenty-Eighth.* By the collision the owner of the Beaconsfield sustained damages amounting to $31,005.46, with interest on $25,583.98 thereof from December 31, 1886, and on $5,421.50 from January 12, 1887. The Britannia suffered damage to the amount of $5,928.46. The owners of the cargo of the Beaconsfield sustained damages amounting to $42,-748.63, with $6,920.82 interest thereon to July 2, 1889.

### CONCLUSIONS OF LAW.

*First.* That those in charge of the Britannia were under a duty to keep their vessel out of the way of the Beaconsfield.

*Second.* That they failed and neglected so to do.

*Third.* That this collision did not occur through inevitable accident.

*Fourth.* That those in charge of the Beaconsfield were free from fault in the premises.

*Fifth.* That the decree of the district court, so far as it divides the damages and costs, should be reversed, and decrees entered in favor of the Beaconsfield, and of the representative of her cargo, against the Britannia, with interest, and costs of both courts; and that the libel of the Compagnie Francaise, etc., against the steam-ship Beaconsfield, in the district and circuit courts, be dismissed, with costs of said libel to the claimants of the steam-ship Beaconsfield, and that the petition of the Compagnie Francaise, etc., to bring the steam-ship Beaconsfield into the suit of John Lucas Cotton and another against the steam-ship Britannia be also dismissed, with costs of the district and circuit courts to the claimants of the steam-ship Beaconsfield.

*Geo. A. Black,* for the Beaconsfield.
*R. D. Benedict,* for the Britannia.
*Sidney Chubb,* for cargo of the Beaconsfield.

LACOMBE, Circuit Judge. The conclusion arrived at in this court as to the liability of the Beaconsfield differs from that of the district court. Inasmuch, however, as this divergence of opinion results from a different understanding of the facts, extended discussion of the authorities cited would be unprofitable.

The findings *supra* contain the statement that the condition of the bottom in the locality where the Beaconsfield reversed was such that there was risk of her running aground should she continue under a port helm. Her navigator, (Sisco,) a Sandy Hook pilot of 40 years' experience, testified to the existence of a reef of rocks some distance off the Battery wall. Of this the chart contains no indication, but the witness insisted with great confidence that it was there, and, although five pilots were called by the Britannia after his testimony was given, not one of them contradicted him on this point. Under these circumstances, his statement is accepted as correct.

The testimony, when examined in the light of the chart, seems to indicate with great distinctness the precise place where the Britannia touched the bottom. If the Beaconsfield's position at that time be taken about as given by the Britannia's witnesses, the distance between them was less than half a mile. For half a minute thereafter the Britannia was running at full speed. Her rate of progress over the ground, when running·at reduced speed, must have been considerably in excess of the Beaconsfield's, the latter steamer being retarded both by the wind and the flood eddy. From the moment of touching till the Beaconsfield reversed, the speed of the Britannia over the ground was probably twice that of the other vessel. Taking these facts into consideration, it seems reasonably certain that, when the Beaconsfield reversed, the vessels could have been not quite four of her lengths apart, instead of a quarter mile, as the district judge found. Of course, to the point of intersection of their respective courses the distance was much less. Whatever may have been the facts as to the Britannia's helm, nothing in her movements up to that time indicated that she was porting. Whether or not she was in fact doing all she could, observers of her motions from the deck of the Beaconsfield had good ground for believing that she was not, and that, if she still intended to take such action, she was delaying until dangerously near the safety limit. There was, indeed, an agreement on her part to go astern, which for the time being presumptively terminated the risk of collision involved in the fact that the vessels were on crossing courses; but the natural conclusion from her movements was that, either intentionally or through some mischance, she was breaking that agreement, and the moment it was broken the risk of collision was renewed. A reasonable time is no doubt required for the execution of maneuvers agreed upon, and the interval between the Britannia's first signal and the Beaconsfield's reversal was short; but,

short though it was, the former vessel had during it passed over a considerable space, had gotten far beyond any shoal water at Governor's island, had nearly crossed the southerly half of the channel, and had passed, without turning into it, quite 600 feet of the deep water fairway into the East river, whither her signal had indicated that she was bound. If she meant to go there, she could now, under the most favorable circumstances, make the necessary turn only in the northerly water, and perilously near the place where the Beaconsfield would be. But not only did the Britannia's movements fail to indicate that she had begun her maneuvers for turning to the eastward, but her swing to the westward indicated a diametrically opposite maneuver. Whether or not she did in fact swing to the westward is in dispute, but there can be little doubt that her sudden dash forward at full speed, with her helm amid-ships, begun when she touched bottom, was continued till all risk of grounding was over, and sufficiently far for her to feel the effect of the tidal action referred to in the fourth finding. If so, she probably did take a swing to the westward, slight, indeed, but perceptible to those on the Beaconsfield.

Judging from appearances, then, it was reasonably certain that, whatever she had promised, she was not executing proper and sufficient maneuvers to keep out of the way. Meanwhile, the situation of the Beaconsfield was such that further progress on her course involved risk of grounding, without assurance of avoiding the collision. All these circumstances would necessarily create in the mind of a prudent navigator a reasonable and strong apprehension that collision would ensue, unless some further action were taken by himself. The vessels had approached over more than half the space which separated them when the Britannia's first signal was heard, and were still approaching, so as to involve risk of collision. If that risk were to be avoided, it was apparently necessary that both vessels should take some action. What that action should be was indicated by the twenty-first rule,—if necessary, each should stop and reverse,—and the necessity for such action had arisen. The special circumstances of the case, as they appeared to the Beaconsfield's navigator, enlightened as to what the Britannia really was doing only by such indications as her movements afforded, called for this maneuver, which the twenty-first rule required, and which her master testifies he considers the essence of safe navigation. A careful collation of the testimony of those on both steamers and elsewhere, assisted by elaborate plotting on the chart, indicates that the probabilities are that the Britannia would have passed astern of the Beaconsfield if the latter had kept her headway, even though she straightened out sufficiently to clear the shoal water her pilot spoke of, but by a very small margin only. The conduct of the Beaconsfield, however, is to be judged in the light of the circumstances as they would have appeared at that time to an experienced and careful navigator standing on the bridge. At that place and time collision seemed imminent, and a reversal necessary to avoid it.

### ON MOTION TO HAVE CASE REOPENED.

(Filed May 5, 1890.)

LACOMBE, Circuit Judge.    This is an application by the owners of the Britannia to have the causes reopened, and to allow them to "furnish further evidence as to the correctness of the coast-survey chart in evidence, and to have a finding that the said chart is correct, and that there was no such reef of rocks as was testified to by the witness Sisco on the trial," and generally for a further hearing.    The application was induced by the eleventh finding of fact, and by a paragraph contained in the opinion.    The said finding is as follows:

"*Eleventh.* At the time the Beaconsfield reversed she had approached so near the New York shore that, in view of her draught of water and the condition of the bottom in that locality, there was some risk of her running aground should she continue her headway much longer under her port helm."

The excerpt from the opinion quoted in the moving papers is as follows:

"The findings (*supra*) contain the statement that the condition of the bottom in the locality where the Beaconsfield reversed was such that there was risk of her running aground should she continue under a port helm.    Her navigator testified to the existence of a reef of rocks some distance off the Battery wall.    Of this the chart contains no indication, but the witness insisted with great confidence that it was there, and, although five pilots were called by the Britannia after his testimony was given, not one of them contradicted him on this point.    Under these circumstances his statement is accepted as correct."

So far as this last excerpt is concerned, it may, if counsel wishes, be stricken from the opinion.    The practice of writing opinions in collision cases (involving more than $5,000) when they are decided in the circuit court seems sometimes of doubtful utility.    In all actions for negligence, where the question is one of reasonable care and prudence, each case necessarily depends upon the co-ordination of its own peculiar facts, and only the most general principles can be of universal application.    The statute requires this court to state separately the findings of fact, and its conclusions of law thereon.    The accuracy of the decision is to be determined by the examination of these findings and conclusions.    If the former are supported by proof, and warrant the conclusions drawn from them, the decision is affirmed; otherwise it is reversed.    It seems to be the plain intent of this practice to limit the argument upon appeal to the facts which are specifically "found."    If those facts are found with sufficient fullness, they should point to definite conclusions; and merely to restate the premises and conclusions in the opinion can rarely be of any assistance, either to counsel or to the appellate court.

The counsel for the Britannia, however, moves to reopen the cause to allow of further proof touching the eleventh finding quoted above.    Of course in such motions it is essential that the moving party should indicate with reasonable fullness what proof is to be offered.    This has been done, the moving papers containing a report of soundings made recently

by an officer of the coast survey, accompanied by a diagram. From these it appears that the four-fathom curve is not correctly shown upon the chart which was in evidence on the trials both in the district court and here. It further appears therefrom that—even if there are no rocks in the locality referred to—there is off the Battery wall a projection of mud or silt which pushes the four-fathom curve further out into the river, and leaves less margin for a vessel, situated as was the Beaconsfield, to maneuver in than the chart shows. Accepting the evidence furnished by the moving papers,—and even without considering the affidavits which were read in opposition,—I am still satisfied that "at the time the Beaconsfield reversed she had approached so near the New York shore that, in view of her draught of water and the condition of the bottom in that locality, there was some risk of her running aground should she continue her headway much longer under her port helm." There is no cause shown, therefore, for reopening the case. The finding, however, now expresses a conclusion (of fact) reached after a consideration, not only of the record in the district court and the additional proofs taken here, but also of the depositions submitted by both parties on this motion. Should there be an exception taken to the eleventh finding, therefore, these depositions will be considered as before the court when the bill of exceptions is certified.

The following additional finding of fact may be made: *Twenty-ninth.* That the line of 24-foot depth of water off the Battery is as laid down on the chart used on the trial, except that about S. S. W. from the Battery flag-staff there is a projection of mud or silt which pushes the 24-foot line out into the river, as laid down on the tracing attached to the affidavit of Lieut. W. P. Elliott, the extreme outer end of which is less than 30 yards northerly from a line drawn W. N. W. through the place of collision, as found in the twentieth finding.