153 U.S. 130 (1894)
THE BRITANNIA (1).[1] THE BRITANNIA (2). THE BEACONSFIELD.
Nos. 340, 341, and 342.
Supreme Court of United States.
Argued April 3, 4, 1894.
Decided April 23, 1894.
APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.
*133 Mr. Robert D. Benedict for the Britannia, appellant.
Mr. George A. Black for the Beaconsfield and Elizabeth Cleugh, appellees.
Mr. Sidney Chubb for Cotton, appellee.
MR. JUSTICE SHIRAS, after stating the case, delivered the opinion of the court.
As both the District Court and the Circuit Court, though for somewhat different reasons, found the Britannia to be in fault, and as we agree with them in that conclusion, it is not necessary for us to go at length into that part of the controversy. It is sufficient to say that it appears that the Britannia came so close to Governor's Island that she grazed the bottom, and rendered it necessary for her pilot to direct her engines to be put at full speed till she cleared the ground. After that the speed of the vessel was slowed, and her wheel was put *134 hard-a-port to round into East River. As found by the Circuit Court, at about the time of touching the bottom, she sighted the Beaconsfield on her starboard bow, and at that time, she blew a single whistle to the Beaconsfield, thus signifying an intention to pass under the stern of the Beaconsfield. After clearing the bottom and reducing her speed, the Britannia did not respond promptly to her helm, owing to the fact, as found in the fourth finding, that "the condition of the wind and tide was such as to form a flood eddy on the north side of the channel between the Battery and Governor's Island, and an ebb tide on the south side of the channel. These tides operate to turn the head of a vessel attempting to enter the East River near Castle William, on Governor's Island to the westward, as she crosses the ebb until she enters the flood eddy. Thereupon her head is turned to the eastward. Such tidal action was within the knowledge of the pilot of the Beaconsfield, and should have been within the knowledge of the pilot of the Britannia." Having placed herself in this predicament, the Britannia's efforts to pass astern of the Beaconsfield were retarded, and her fault was in that particular, that is, in running, at a place where she was liable to meet outward going vessels, across the ebb tide in such a way that the current prevented her from answering her helm with promptness. While this fault was not, as we shall hereafter show, the sole cause of the accident, it contributed to it, and upon the findings, we agree with both the lower courts in thinking the fault was enough to render the Britannia liable, in whole or in part, for the loss occasioned by the collision. In exoneration of the Britannia her advocate cites the case of The Rhondda, 8 App. Cas. 549, 555. That was a case somewhat similar in its facts to the present one. The Rhondda was coming around a point in the Straits of Messina, meeting another steamer, the Alsace-Lorraine. They came into collision, and the Alsace-Lorraine was sunk. Her owners libelled the Rhondda, but the Privy Council sustained the navigation of the Rhondda. She had the other vessel on her starboard bow, and therefore it was her duty to keep out of the way of the Alsace-Lorraine. This she attempted to do by going to *135 the starboard and passing under the stern of the other vessel. There was a current which checked the swing of the Rhondda to the starboard, and her captain, as soon as he saw that his vessel was not swinging off to starboard, under his port helm, as he had expected, stopped and reversed his engines. The court held that, as it appeared that the Rhondda had ported her helm, and that such action would have carried her clear of the other steamer if she had not been prevented by the current, the Rhondda was free from blame. The manuvres, therefore, of the Britannia and the Rhondda were alike. They were both meeting another steamer on their starboard bow. They both, in compliance with the rule of navigation applicable to such a case, endeavored to pass under the stern of the other vessel by porting the helm, and they both, when it was seen that the vessel was not swinging as rapidly to the starboard as was expected, stopped and reversed engines. The reason why, if the Rhondda was justly exonerated, the Britannia is not entitled to a like judgment, is found in the different circumstances in which the vessels were placed.
As we have seen, the Britannia was entering one of the most crowded harbors in the world, and was liable to meet other vessels outward bound at any moment. It was also obvious, from her course in running close to Governor's Island, that any vessel she would meet, as she entered the strait after she cleared the island, would probably be on her starboard bow. Knowing, as she was bound to know, that, in the condition of the tide at the time, there was a conflict between the current and the eddy which would be apt to thwart or retard her movement to the starboard, it was her duty to have rounded the island at the very lowest rate of speed which would have enabled her to answer to her helm. This she failed to do, and, although her subsequent movements were skilful and in accordance with the rules, she must be held answerable for her original fault in rounding the island so closely that it was found necessary to put her engines, for a time, at full speed in order to clear her from the ground. This temporary enhancement of speed, and the failure to anticipate and guard against *136 the consequences of a well-known current, rendered her subsequent efforts to avoid the collision unavailing.
On the other hand, in the case of the Rhondda, Sir James Hannen, in the course of his opinion, said: "Undoubtedly it was strongly in evidence that there was such a stream at this place, whether it be called current or eddy, as was calculated to have an effect in the manner suggested on a vessel coming round into the neck of the channel, ... and would be felt upon the starboard bow of a vessel precisely at the point where the Rhondda had arrived." But he proceeded to say: "The Rhondda had no reason to anticipate that the operation of the current or eddy would have any bearing upon her duty with reference to the Alsace-Lorraine, because she had a right to expect that the coast would be clear from steamers coming out in the direction in which the Alsace-Lorraine was."
This brings us to a consideration of the conduct of the Beaconsfield, and here the courts below parted company  the District Court having held that the Beaconsfield's management was faulty, while the Circuit Court found her free from blame. Of course, this court must accept the facts as found for us by the Circuit Court, but we do not observe any substantial difference in the facts as understood by the respective courts. Their diversity in opinion arose from a difference in their application of the rules of navigation to the admitted or established facts.
What were those facts? The Beaconsfield decried the Britannia when the latter vessel came around Governor's Island, and about the time she was disengaging herself from the ground. The Beaconsfield thereupon blew a single blast of her whistle, which meant that she expected the Britannia to pass under her stern. It is found that this whistle of the Beaconsfield was neither heard nor seen on the Britannia, but the latter's whistle, given while getting clear of the bottom, was heard on the Beaconsfield, and taken to be an answer to her own whistle. It is thus evident that the pilots of both vessels agreed in the view that the proper thing to avoid collision was for the Britannia to swing to starboard and pass behind the Beaconsfield. It was next found that the Beaconsfield, *137 when she blew her first whistle, put her helm to port a little and went on at a slow speed. Her observation of the Britannia did not show that the latter was swinging to starboard, but even was disclosing a little more of her starboard side to the Beaconsfield. Thereupon the latter blew another single whistle, which still signified her expectation that the Britannia would pass astern, and, hearing no answer, put her wheel hard-a-port, and stopped her engines and reversed full speed. Her engines were kept reversed until her headway was stopped. Then her engines were stopped, and, at the time of the collision, she was nearly, if not quite, dead in the water. After her headway was thus stopped, the Beaconsfield took no further action, and lay still in the water until struck. The time from such stopping of her headway until the collision, during which she lay still, was about a minute and a half. It is further found that if the Beaconsfield had not stopped and backed, it is probable that the Britannia would have passed a short distance astern of her; and, indeed, under the finding as to her rate of speed before she stopped, this is quite evident.
Was this behavior of the Beaconsfield in stopping her headway and remaining still, without further effort, for a minute and a half, proper, or, at least, excusable, as held by the Circuit Court? Or was it improper, and did it put her in contributory fault, as held by the District Court?
In answering this question we must have regard to the well-known rules of navigation. Those chiefly applicable to the present controversy are rules nineteen, twenty-one, twenty-three, and twenty-four. Rev. Stat. § 4233.
The nineteenth rule is as follows: "If two vessels under steam are crossing so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other." We do not understand this rule to signify, as the Circuit Judge seems to have thought, that the Britannia was, at all hazards and in some way or other, to avoid the Beaconsfield. Such a rendering of the rule would dispense with all inquiry beyond the single one, which vessel had the other on her starboard side. The plain meaning of *138 the rule was, as applied to the situation under consideration, that the Britannia, which had the Beaconsfield on her starboard side, should yield the path to the latter, and pass behind her. This reading of the rule was recognized and complied with in the first instance by the pilots of both vessels in signalling each other that the Britannia would go astern.
Rule twenty-one provides that "every steam vessel when approaching another vessel so as to involve risk of collision shall slacken her speed, or, if necessary, stop and reverse." This rule was likewise obeyed by both ships, in that, so long as they were advancing, after having seen and signalled each other they went at a slow rate of speed. Later, in the history of the incident, they both stopped and reversed. In so doing the Britannia was clearly obeying the letter and spirit of the rule. Whether the Beaconsfield was justified in stopping and reversing we shall presently consider.
The twenty-third rule directs that "when by rules ... nineteen, ... one of two vessels shall keep out of the way, the other shall keep her course, subject to the qualifications of rule twenty-four." This rule throws light on the meaning of the nineteenth rule, and confirms the view that the latter rule means that the vessel having the other on her starboard shall yield the way or path to the other, and it further provides that the latter vessel not only may but must keep on her course, except as qualified by the twenty-fourth rule. That rule is as follows: "In construing and obeying these rules due regard must be had to all dangers of navigation, and to any special circumstances which may exist in any particular case rendering a departure from them necessary in order to avoid immediate danger."
As we have seen, the Britannia fulfilled the duty imposed on her, by signalling that she would keep out of the way and pass to the stern of the Beaconsfield, by slackening her speed, and, finally, by stopping and reversing. Her only fault was in overlooking or disregarding the effect of the wind and tide, so that when she endeavored to swing to the starboard, she was unable to do so with reasonable quickness.
But did not the Beaconsfield manifestly depart from and *139 disobey rule twenty-three in not keeping her course, and thus avoiding collision? Her excuse, in application of rule twenty-four, is that the Britannia, after having signalled that she was going astern, did not appear to be doing so, and that this erratic behavior justified the Beaconsfield in stopping and reversing. But, as already stated, the pilot of the Beaconsfield was well aware of the existence of the counter current against which the Britannia had to contend in changing her course to the starboard, and if we are obliged to impute fault to the Britannia, in not having foreseen and provided against that current, so we must likewise blame the Beaconsfield for overlooking the effect of such current in delaying the movement of the Britannia to the starboard. The course of the Britannia was precisely what might have been anticipated, after her first and only fault, and did not, in our judgment, warrant the Beaconsfield in disregarding the injunctions of the twenty-third rule, which, if obeyed, would have prevented the collision.
We think there was likewise fault in the action of the Beaconsfield in remaining motionless for a minute and a half, in full view of the tardy motion of the Britannia in getting astern. This is sought to be excused by the fact that her pilot feared certain rocks, or a rocky bottom, which were not far from the place where his vessel was. The actual existence of such rocks or rocky bottom was somewhat in dispute; but accepting, as we do, the statement of the Circuit Court on the subject, we cannot sustain the conduct of the Beaconsfield. That statement is that "a careful collocation of the testimony of those on both steamers and elsewhere, assisted by elaborate plotting on the chart, indicates that the probabilities are that the Britannia would have passed astern of the Beaconsfield if the latter had kept her headway, even though she straightened out sufficiently to clear the reef her pilot spoke of, but by a very small margin only."
Stress is laid in the argument for the Beaconsfield on the eleventh finding, that "at the time the Beaconsfield reversed she had approached so near the New York shore that, in view of her draft of water and the condition of the bottom in that locality, there was some risk of her running aground *140 should she continue her way much longer under her port helm."
But the exigency, as shown by the other findings, did not require that she should continue her way "much longer." Had she advanced one hundred and fifty feet, the collision would not have taken place.
This alleged danger of running aground on the New York shore, if she continued her course, was not set up in the thrice amended pleadings, and seems, as well as the suggestion that there were rocks, not shown on the charts, on the course the Beaconsfield was going, to have been an afterthought, by way of excuse, of the pilot of the Beaconsfield.
But allowing the finding to stand, it does not establish as a fact in the case that there was any real danger to the Beaconsfield in keeping on her course for the very short distance that would have avoided the collision. Nor was it necessary, as the findings show, that in going on the Beaconsfield should have approached any closer to the New York shore. There was plenty of time and room for her to have changed her course sufficiently to have avoided a nearer approach to the north shore.
As for the other excuse, advanced by the pilot of the Beaconsfield, that there were rocks ahead, as already stated, it was disposed of by the learned judge of the Circuit Court, who, when asked to affirmatively find that there was no reef of rocks about 1500 feet from the Battery flag, or in that neighborhood, as testified to by the pilot of the Beaconsfield, refused on the stated ground that it was "immaterial, as by findings already made the collision happened well inside of such point."
The thirteenth finding, that "shortly after the Beaconsfield began reversing the Britannia commenced to swing to starboard, a motion which was perceived on the Beaconsfield," is important, and strengthens the case against her. Seeing the Britannia at last, however tardily, taking the direction which the rule and the exchanged signals required, it was misconduct in the Beaconsfield to continue reversing, and to finally remain motionless.
*141 It cannot be reasonably held that the thirty-first finding was a finding of fact, obligatory upon this court. It is in these words: "The conduct of those in charge of the Beaconsfield, as specifically set forth in the foregoing finding, does not warrant the inference that there was, on their part, negligence contributory to produce the collision."
Of course, if this were a finding of fact, within the meaning of the rule, it would be conclusive of the case, and all the other findings would become mere surplusage. But it is evident that the learned judge did not intend it to be so regarded. It was plainly meant as an additional conclusion in law. He speaks of it as "an inference from the foregoing findings." Nor can we assent to the proposition that it is competent for the judge, who is to find the facts for this court, to shut us off from a consideration of the legal effect of the other facts found, by a conclusive finding that, in his opinion, a particular inference is or is not warranted by the facts so found.
Regarding, therefore, this finding as merely expressive of the learned judge's view of the legal conclusion that arose upon the facts as found, and giving reasonable effect to his findings of fact, we are unable to concur in his conclusion.
The disregard by the Beaconsfield of the Britannia's signal, her failure to obey the rule and keep her course, and her supine negligence in remaining motionless for so long a period, while she saw the Britannia approaching her, clearly put her in fault.
It is argued that the words "shall keep her course" do not mean that she shall maintain her speed, and English cases are cited to the effect that the rule does not imply that the vessel shall maintain the same speed. If this is all that is meant in the cases cited, and we so read them, we have no reason to disagree with them, and they do not, in the slightest degree, impugn our reasoning. But if the contention is, and if those cases must be understood as holding that a vessel, whose duty it is to keep her course, complies with that duty by reversing her engines and ceasing to move at all, we are unable to concur in such a view. It is inconsistent with both the words and *142 the sense of the rule. A vessel which voluntarily becomes motionless cannot properly be said to keep her course. The word "course," both from its etymology and the primary meaning given to it by lexicographers, signifies a running or moving forward  a continuous progression or advance.
The collocation of the rule, and its direct references to rules 17, 19, 20, and 22, plainly point to the meaning that, while the other vessel must keep out of the way, the preferred vessel shall not interfere with or thwart the movements of such other vessel by bringing a new element into the calculation, which would be done if, instead of pursuing her course, she stopped her headway. It is not meant that some exigency or obvious danger might not justify her in checking her speed, and even in stopping altogether. But such a case is provided for in the twenty-fourth rule. As we have seen, no such exigency is found to have existed in the present case.
We are relieved from any force there may be in the suggestion that we ought to follow the construction supposed to have been put upon this rule by the English courts, in order that there should be no difference between the courts of the two countries in construing the same rule, by the act of August 19, 1890, 26 Stat. 327, which declares that the rule shall be read as follows: "Where by any of these rules one of two vessels is to keep out of the way, the other shall keep her course and speed." It, however, appears that this act awaits the proclamation of the President to become operative.
The case of The Northfield and The Hunter, 4 Ben. 112, 116, is applicable to the present question in regard to the management of the Beaconsfield. There, the Northfield, a Staten Island ferry-boat, had left her slip to go west of Governor's Island, and was swinging round from south to southwest. The Hunter was coming down the North River and heading south to go down west of Governor's Island. The vessels were therefore in similar positions in respect to each other as the vessels in the present case. The District Court for the Southern District of New York held, per Blatchford, J., as follows: "Under the circumstances, the Northfield had the Hunter on her own starboard side, and it was the duty of *143 the Northfield, under the rule, to `keep out of the way' of the Hunter. It was equally the duty of the Hunter `to keep her course.' The Northfield ported her helm to a sufficient extent to enable her to pass safely under the stern of the Hunter. When, however, the Hunter was about three hundred yards distant from the Northfield, instead of keeping her course, she stopped her engines. It is quite clear that if the Hunter had not stopped at all, but had kept her course, the Northfield would have passed safely under the stern of the Hunter. The stopping by the Hunter was the cause of the collision." Disposing of the excuse set up by the Hunter for her stopping, that her navigator assumed that the Northfield was intending to pass ahead of the Hunter rather than astern of her, the learned judge said: "In so assuming they took the risk of being wrong in the assumption." This case was affirmed in the Circuit Court, and also in this court, in which this language was used: "The officers of the tug perfectly understood that under the rule it was their duty to keep the tug on its course. The officers of each vessel had the right to assume that the other vessel would do its duty, and to make their course and keep their speed on that assumption." Hutchinson v. Northfield, 24 L.C.P. Co. Rep. 680, 681. In the case of The Elizabeth Jones, 112 U.S. 514, 523, it was said: "Conceding it to have been the duty of the Willis, under article 12, to keep out of the way of the Jones, it was equally the duty of the latter not to baffle or to prevent the efforts of the Willis to that end. Her departure from the requirement of article 18 that she should keep her course cannot be justified under article 19, because there were no special circumstances in such departure necessary in order to avoid immediate danger."
In Belden v. Chase, 150 U.S. 699, it was said: "It is a settled rule in this court that when a vessel has committed a positive breach of statute she must show not only that probably her fault did not contribute to the disaster, but that it could not have done so. Obedience to the rule is not a fault, even if a different course would have prevented the collision... . Masters are bound to obey the rules and entitled to rely on the assumption that they will be obeyed, and *144 should not be encouraged to treat the exceptions as subjects of solicitude rather than the rules."
In Crockett v. Newton, 18 How. 581, 583, it was said by Mr. Justice Curtis: "It must be remembered that the general rule is, for a sailing vessel meeting a steamer, to keep her course while the steamer takes the necessary measures to avoid a collision. And though this rule should not be observed when the circumstances are such that it is apparent its observance must occasion a collision, while a departure from it will prevent one, yet it must be a strong case which puts the sailing vessel in the wrong for obeying the rule." "But the duty of the steamer [to port her helm and go to the starboard] implies a correlative obligation of the ship to keep her course." The Scotia, 14 Wall. 170, 181.
"It is the duty of a steamer to keep out of the way of a sailing vessel when they are approaching in such directions as to involve a risk of collision. The correlative obligation rests upon the sailing vessel to keep her course and the steamer may be managed upon the assumption that she will do so." The Free State, 91 U.S. 200.
It is true that some of the cases just cited were cases wherein the vessel whose duty it was to keep her course was a sailing vessel, yet the principle involved is the same in the case of two steamships crossing, where it is the duty of the one who has the other on her starboard bow to keep out of the way of the other, and of the latter to keep on her course.
The conclusion reached is the same as that arrived at in the District Court, and, accordingly, we reverse the three decrees, and remand the causes to the Circuit Court, with directions to enter decrees in accordance with this opinion, that both vessels were in fault, and the damages should be divided.
Reversed.
MR. JUSTICE BROWN, with whom concurred MR. JUSTICE JACKSON, dissenting.
I cannot agree with the court in holding the Beaconsfield to have been in fault for this collision. Her conduct, so far *145 from being reckless or in violation of the rules of good seamanship, appears to me to have been characterized by an excess of prudence, which, even if it were an error, was not a fault for which I would willingly condemn her. This court has had frequent occasion to hold steamers liable for too great speed. This is the first in which we have condemned one for too little. Indeed, cases in which steamers have been held liable for not maintaining their speed are extremely rare, both in this country and in England; and, if any such exist, I think they will be confined to those wherein tugs descending a river with tows have been held in fault for stopping and allowing their tows to spread out in the path of ascending vessels. It seems to me that the conclusion that the Beaconsfield was in fault for stopping and reversing can only be reached by ignoring the most vital findings of fact with respect to her conduct, and proceeding upon the theory that, because the collision would not have happened if she had kept her speed, it was necessarily a fault that she had not done so.
The findings, so far as they bear upon the questions at issue, are as follows:
"Fifth... . When about midway between Diamond Reef and the New York piers she saw the Britannia as the latter came clear of Castle William, and blew a single whistle to her. The Beaconsfield was then heading about W.N.W. or W. by N. The full speed of the Beaconsfield was between nine and ten knots, with fifty-six revolutions. At this time her engines were moving under an `easy ahead,' with thirty revolutions, which would make her speed through the water about five knots. The retardation due to the action of the wind and to that of the flood eddy (described in the fourth finding) greatly reduced her speed over the ground as she came within the influence of the eddy to considerably less than four knots."
"Eighth... . While getting clear of the bottom, and with her engines at full speed, she [the Britannia] blew a single whistle to the Beaconsfield. The whistle of the Beaconsfield referred to in the fifth finding was neither heard nor seen on the Britannia, but the latter's whistle, given while getting *146 clear of the bottom, was heard on the Beaconsfield, and taken to be an answer to her own signal. At the time the Britannia thus signalled the distance between the steamers was not quite half a mile.
"Ninth. After clearing the bottom the Britannia ported and hard-a-ported her helm, but her bow while in the ebb tide near Governor's Island did not swing to starboard, but, on the contrary, did for a brief space take a slight but perceptible swing to the westward... .
"Tenth. When the Beaconsfield blew her first whistle her wheel was put to port a little and kept steady-a-port, and under her slow engine she drew ahead, her head inclining a little toward the New York docks. A careful watch was kept on the movements of the Britannia, and it was observed not only that she did not swing to starboard, but also that she was showing a little more of her starboard side to the Beaconsfield; thereupon those upon the Beaconsfield, while still about four lengths from the Britannia, blew another single whistle, and hearing no answer put their wheel hard-a-port, and stopped and reversed full speed. Her engines were kept reversed until her headway was stopped. Then her engines were stopped, and at the time of the collision she was nearly, if not quite, dead in the water.
"Eleventh. At the time the Beaconsfield reversed she had approached so near the New York shore, that in view of her draft of water and the condition of the bottom in that locality, there was some risk of her running aground should she continue her headway much longer under her port helm. At that time the Britannia, not yet swinging to the eastward, was heading so as to cross the bows of the Beaconsfield, had advanced over a considerable part of the distance which separated them when she blew her first whistle, and was manifestly coming into the northern part of the channel.
"Twelfth. This second whistle from the Beaconsfield was not heard on the Britannia. The latter also blew a second single whistle and thereafter a third, neither of which was seen or heard on the Beaconsfield.
"Thirteenth. Shortly after the Beaconsfield began reversing, *147 the Britannia commenced to swing to starboard, a motion which was perceived on the Beaconsfield.
"Fourteenth. The captain of the Britannia had noticed that she did not swing as promptly as he had expected after clearing the bottom, and after she did begin to swing he saw that she needed to come more to starboard, and that the ships for some reason did not get clear of each other; and, differing from the pilot as to the chance of clearing the Beaconsfield if he kept on, he gave the order to reverse his engines; thereafter he let go his port anchor when about one hundred feet from the Beaconsfield."
"Twenty-fourth. At the time these steamers sighted each other and signalled, they were crossing so as to involve risk of collision, within the meaning of the nineteenth rule, and the Britannia had the Beaconsfield on her starboard side.
"Twenty-fifth. At the time when the Beaconsfield stopped and reversed, the vessels were approaching each other so as to involve risk of collision. A prudent navigator viewing the situation at that moment from the deck of the Beaconsfield would have reached the conclusion that, if neither the course of the Britannia were altered nor her headway checked, collision was imminent and inevitable, unless avoided by some change in the movements of the Beaconsfield.
"Twenty-sixth. The Britannia's movements, visible to the Beaconsfield, were not in accordance with the single whistle she had blown, but were such as to create a natural, reasonable, and strong apprehension of collision in those in charge of the Beaconsfield, and they were thereby justified in taking the statutory precaution to avoid risk of collision, which is prescribed by the 21st rule for a vessel approaching another vessel so as to involve risk of collision."
Although the collision occurred in November, 1886, after the Revised International Regulations, adopted by act of Congress of March 3, 1885, c. 354, 23 Stat. 438, took effect, the case was treated by court and counsel as covered by the rules prescribed in Rev. Stat. § 4233, which do not, however, differ materially from the Revised Regulations.
In connection with the above findings, the following rules are pertinent:
*148 "Rule nineteen. If two vessels under steam are crossing so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."
"Rule twenty-one. Every steam vessel, when approaching another vessel, so as to involve risk of collision, should slacken her speed, or, if necessary, stop and reverse."
"Rule twenty-three. Where, by rules seventeen, nineteen, twenty, and twenty-two, one of two vessels shall keep out of the way, the other shall keep her course, subject to the qualifications of rule twenty-four.
"Rule twenty-four. In construing and obeying these rules, due regard must be had to all dangers of navigation, and to any special circumstances which may exist in any particular case rendering a departure from them necessary in order to avoid immediate danger."
Two questions are naturally raised by the above findings: (1) Whether the obligations imposed upon the privileged vessel by rule 23, to "keep her course," also obliges her to maintain her speed. (2) Granting that it does, whether this requirement applied to the Beaconsfield under the peculiar circumstances of this case.
(1) The first proposition depends upon what is meant by keeping the course of a vessel. The word "course," as used in this connection, is defined by the lexicographers as follows: By Webster, as "progress from point to point without change of direction; any part of a progress from one place to another, which is in a straight line or in one direction." By Worcester, as "the track or line of motion; direction in which motion takes place." And by the Imperial Dictionary, as "the direction of motion; the line in which a body moves; as what course shall the pilot steer; the course of a projectile through the air."
Now, unless we are to give to the word "course" a meaning quite different from that given by the grammarians, we must hold that the steamer discharged her obligation to "keep her course" by keeping steadily in the direction in which she had been previously going. But we are not without authority upon this point. In the case of The Beryl, which was a collision in the North Sea between the steamship Abeona and the *149 steamship Beryl, the two vessels were approaching each other at right angles, the Beryl being upon the starboard side of the Abeona. The Abeona admitted that the Beryl kept her course, but claimed that she kept it too long, directly the contrary of the claim made by the Britannia in this case. The Beryl eased her engines from a quarter to half a mile distant from the Abeona. It was held by the admiralty court, 9 P.D. 4, that although the obligation to keep her course was applicable, yet the Beryl was bound not to disregard the obligation of the other article to stop and reverse, if necessary to avoid a collision, and that both articles were applicable to the case. The admiralty court held that the Beryl did act in time in stopping her engines, but on appeal to the Court of Appeals the case was reversed, 9 P.D. 137, 140, 141, 142, 144, and the Beryl held to be in fault, not for failing to maintain her speed, but for failing to stop and reverse her engines in due time. In delivering the opinion of the court, Brett, Master of the Rolls, observed: "It was suggested to us to-day that `keep her course' meant keeping her course at the same pace at which she was going before she was called upon to obey this rule. But keeping her course means that she is to keep on the same direction as before: it has nothing to do with the question of speed... . The Abeona was bound to get out of the way of the Beryl; the moment that rule applied to the Abeona, art. 22 applied to the Beryl, namely, to keep her course... . The Abeona did everything that was wrong; and then the question arises, did the Beryl break any of the rules? She kept her course, and when she saw that the Abeona was not doing her duty she whistled... . Seeing the Abeona was still keeping on, she whistled again and slackened her speed. The first question upon that is this  were the circumstances such, then, that there was risk of collision? The vessels were at a distance of from a quarter to half a mile. At that time the officer of the Beryl slackened his speed."
Bowen, Lord Justice, observed: "It has been suggested that the expression `keep her course,' used in art. 22, refers to the speed of the vessel as well as to the direction of her *150 head, but this is an untenable argument. In art. 18 we find the words `stop and reverse if necessary,' which obviously are intended to point out that the vessel, when it is necessary, is to do more than simply slacken her speed. It may, however, be a matter of consideration whether `if necessary' is to be construed as meaning if it is actually necessary, or only if the captain should reasonably think that a necessity has arisen; but even if we were to take the latter as the construction most favorable to the master of the Beryl, the answer of our assessors to the question put to them, which the Master of the Rolls has already referred to, puts him clearly in the wrong, and obliges us to hold that the Beryl was also to blame for this collision."
Fry, Lord Justice, was of the same opinion, and thought that the Beryl should have stopped and reversed earlier than she did.
This case is not only inconsistent with the opinion of the court in the case under consideration, but is absolutely the reverse of it.
In view of the fact that these rules are international and have been pronounced by this court to be a branch of the international law, The Scotia, 14 Wall. 170, it is of the utmost importance that the same construction should be placed upon them by all courts upon which they are obligatory, and the fact that the courts of the country in which they were first adopted has given them a certain construction is a cogent argument in favor of a similar construction elsewhere. There is a peculiar propriety in its application in this case in view of the fact that the Beaconsfield was a British vessel, and its officers presumably acquainted with the law of their flag. The only case to the contrary to which our attention has been called is that of The Northfield and The Hunter, 4 Ben. 112, in which, however, no such general rule of construction was laid down. But, under the peculiar circumstances of that case, to which I shall advert hereafter, as distinguishing it from the case under consideration, it was held that the privileged vessel was in fault for stopping and reversing.
*151 (2) But, whatever be the interpretation of this rule, it seems to me clear that, under the circumstances of the particular case, the Beaconsfield was guilty of no fault in stopping and reversing. It will not for a moment be claimed that a steamer is bound to keep up her speed, if her master can see that by so doing she must inevitably be brought into collision with the other vessel. He is not, by a persistent adherence to any rule, at liberty to thrust himself directly in the path of an approaching vessel. There is certainly a point in every case beyond which he is not bound to proceed. The obligation to avoid a collision, if it be possible to do so, must be read into and made a part of all steering and sailing rules, and is specially provided for in rule 24, that "in construing and obeying these rules, due regard must be had to all dangers of navigation, and to any special circumstances which may exist in any particular case rendering a departure from them necessary in order to avoid immediate danger." There is no rule of more general observance than that which requires sailing vessels to keep their course when approaching a steamer, and yet in The Sunnyside, 91 U.S. 208, a sailing vessel was condemned for persistently adhering to the rule, and running down a steam tug, which lay motionless upon the water, although the latter was conceded to be in fault for not getting out of her way. "Negligence more manifest," said Mr. Justice Clifford, "culpable or indefensible, in view of the circumstances, is seldom exhibited in controversies of this character; and the only excuse offered for it is, that the 18th sailing rule provides that, where one of two ships is required to keep out of the way, the other shall keep her course; entirely overlooking the fact that the mandate of that rule is declared by the rule itself to be subject to the qualification" of rule 24. See also The Isaac Newton, (Crocket v. Newton,) 18 How. 581; Wilson v. Canada Shipping Co., 2 App. Cas. 389.
So, rule 23, which requires the privileged steamer to keep her course, must, like all others, be read in connection with rule 21, that every steam vessel when approaching another vessel so as to involve risk of collision shall slacken her speed, or, if necessary, stop and reverse.
*152 This case then reduces itself to the question whether, at the time the order was given upon the Beaconsfield to stop and reverse, the master had a right, in the exercise of a reasonable judgment, to suppose that, if he persisted in his speed, a collision was probable  in other words, had he reason to believe there was danger of collision? The sequence of events after the steamers came in sight of each other, as appears from the findings, was as follows:
When about midway between Diamond Reef and the New York piers she (the Beaconsfield) saw the Britannia as the latter came clear of Castle William and blew a single whistle to her. Owing, probably, to a strong wind then blowing from the west, (about 22 miles an hour,) this whistle of the Beaconsfield was not heard upon the Britannia. The latter, however, while getting clear of the bottom and her engines at full speed, blew a single whistle to the Beaconsfield, which was heard and taken to be an answer to her own signal. At this time the vessels were not quite half a mile apart. Although, after clearing the bottom, the Britannia ported and hard-a-ported her helm; her bow, while in the ebb tide near Governor's Island, did not swing to starboard, but on the contrary, for a brief space took a slight but perceptible swing to the westward  to port. It was seen upon the Beaconsfield, not only that the Britannia did not swing to starboard, but that she was showing a little more of her starboard side to the Beaconsfield; whereupon the Beaconsfield, while still about four lengths from the Britannia, blew another single whistle, and hearing no answer, put her wheel hard-a-port, and stopped and reversed at full speed until her headway was stopped, when her engines were stopped and she remained motionless in the water.
Was she in fault for so doing? There were three circumstances calculated to excite the apprehension of her master. (1) The Britannia, instead of swinging to starboard, appeared to be swinging to port. That this also alarmed those on the Britannia is evident from the fourteenth finding, that after she began to swing her master saw that she needed to come more to starboard; that the ships did not, for some reason, *153 get clear of each other, and, differing in opinion from the pilot, he gave the order to reverse the engines. (2) She did not at once answer the Beaconsfield whistle  a circumstance tending to show either that she did not hear it, or disregarded it. In view of the fact that the steamers were not more than ten or twelve hundred feet apart, this silence was certainly alarming. (3) At this time, too, the Beaconsfield had approached so near the New York shore that, in view of her draft of water and the condition of the bottom, there was some risk of her running aground, should she continue her headway much longer under her port helm. In this condition of things we are confronted by the 25th and 26th findings, that at the time the Beaconsfield stopped and reversed, the vessels were approaching so as to involve risk of collision. That a prudent navigator, viewing the situation from the deck of the Beaconsfield, would have reached the conclusion that, if the course of the Britannia were not altered nor her headway checked, a collision was imminent and inevitable, unless avoided by some change on the part of the Beaconsfield. And (finding 26) that the Britannia's movements visible to the Beaconsfield were not in accordance with the single whistle she had blown, and were such as created a natural, reasonable, and strong apprehension of collision in those in charge of the Beaconsfield. Under these circumstances I agree with the opinion of the court below that the Beaconsfield was justified in taking the statutory precautions to avoid risk of collision prescribed by the 21st rule, as to stopping and reversing.
The case of Northfield and Hunter, 4 Ben. 112, decided by Judge Blatchford, whose experience as an admiralty judge undoubtedly entitles his opinions to most respectful consideration, is clearly distinguishable from this. In that case the Northfield was going at a speed of from nine to ten knots an hour, while the Hunter, the privileged vessel, with a schooner in tow, was not going more than two knots an hour. The master of the Hunter, who was fearful that the schooner would get adrift if any extra strain should come upon his lines, stopped his vessel. But the court expressly finds that such stopping did not occur in articulo periculi, but took *154 place at a distance from the Northfield which would have enabled the latter easily to have avoided her.
The only excuse for holding the Beaconsfield in fault is, that her pilot was bound to know the existence of the eddy, which gave the Britannia's bow a swing to port, before she answered her wheel to swing to starboard. Considering, however, the proximity of the two vessels at this time, and the failure of the Britannia to promptly respond to the Beaconsfield's whistle, I do not think the pilot of the latter was bound to know the precise moment when the Britannia would begin to answer her helm, and swing her bow to starboard. The vessels were in such proximity that seconds became of the utmost importance, and the failure on the Britannia to do exactly what she ought to have done meant inevitable disaster.
The case of The Rhondda, 8 App. Cas. 549, so far from being an authority in favor of the position assumed by the court in this case, is, as I read it, directly the contrary. The Rhondda, having the Alsace-Lorraine on her starboard side, was rounding Faro Point at the entrance of the Straits of Messina, when she observed the Alsace-Lorraine at a distance of half a mile and about a point on her starboard bow. The Rhondda at once put her helm hard-a-port, but failed to answer her wheel in consequence of the strong current at the entrance of the straits  the ancient Charybdis. She then blew her whistle and stopped and reversed her engines at full speed, and was held to have performed her full duty. The Alsace-Lorraine did not ease or stop her engines, but put her helm hard-a-port, and was struck by the Rhondda nearly amidships, and was held to have been in fault. I think the case tends to show that the Beaconsfield was right in her manuvre.
I would apply to this case the observations of this court in the case of The Favorita, 18 Wall. 598, 603, in which a collision occurred under somewhat similar circumstances: "It is said if the Manhasset had advanced instead of stopping she would have cleared the steamship. This may or may not be true; but if true, she is not in fault for this error of judgment. It was a question whether to advance or stop and back, and the emergency was so great that there was no time to *155 deliberate upon the choice of modes of escape. In such a moment of sudden danger, caused by the misconduct of the Favorita, the law will not hold the pilot of the Manhasset, acting in good faith, guilty of a fault, if it should turn out after the event that he chose the wrong means to avoid the collision, unless his seamanship was clearly unskilful. And this we do not find to be the case. On the contrary, if there were error at all, it was such a mistake of judgment as would likely be committed by any one in similar peril." (See S.C. 1 Ben. 30; 8 Blatchford, 539.)
I agree with the court that the thirty-first finding is a finding of law and not of fact, but I think it was such a legal conclusion as was justified by the other findings.
For these reasons I am of opinion that the decree of the Circuit Court should be affirmed.
MR. JUSTICE JACKSON concurred in this opinion.
NOTES
[1] The docket titles of these three cases were: 340, Steamship Britannia, La Compagnie Française de navigation à vapeur, Cyprien Fabre et Compagnie, Appellants, v. Elizabeth Cleugh, Executrix of George Cleugh, deceased; 341, The Steamship Britannia, etc., Appellant, v. John Lucas Cotton; 342, La Compagnie Française de navigation à vapeur, Cyprien Fabre et Compagnie, Appellants, v. The Steamship Beaconsfield and Elizabeth Cleugh, Executrix of George Cleugh, etc.