## THE PROHIBITION OF A BOILER FACTORY NEAR A PENITEN-
## TIARY UNCONSTITUTIONAL.

[Circuit Court of Franklin County.]

SAMUEL BORGER v. THE STATE OF OHIO.

Decided, September 28, 1903.

*Police Power—In the Restriction of Objectionable Trades—To Certain
Localities—Legislative Prohibition Justified, When—Act of May 12,
1902, Unconstitutional as to Boiler Factories and Penal Institu-
tions.*

The act of May 12, 1902 (95 O. L., 592), in so far as it makes it an offense to
erect or operate, within four hundred feet of the administration depart-
ment of any state penal institution, any boiler factory which makes
a loud noise, is unconstitutional, because the operation of such a factory
is not a nuisance *per se*, and it does not appear that such restriction is
imposed in the public as distinguished from private interest.

SUMMERS, J.; SULLIVAN, J., and WILSON, J., concur.

It is not important to state the case in detail, or to notice many
of the questions argued by counsel.

By an act passed May 12, 1902 (95 O. L., 592), the General
Assembly makes it an offense to erect or operate within four hun-
dred feet of the administration department of any state penal
institution any boiler factory which may make loud noises. It is ad-
mitted that the plaintiff in error erected and operated such a
factory within four hundred feet of the administration building
of the Ohio State Penitentiary, and that he purchased the land
on which the factory is located for that purpose; that if the
premises can not be so used they are depreciated $10,000, and that
the members of the General Assembly had knowledge before the
passage of the act of the fact that the purchase had been made
for that purpose. It is said in argument that the managers of
the penitentiary wanted the ground for that institution and pro-
cured the passage of the act to aid them in getting it. The plaint-
iff in error was found guilty in the police court of a violation
of this statute and fined. On error the court of common pleas af-
firmed it and the case is here on error to that court.

We can not of course inquire into the motives of the members
of the General Assembly.

It is well settled that a state in the exercise of its police power
may restrict objectionable trades to certain localities, but "To

justify the state in thus interposing its authority in behalf of
the public, it must appear, first, that the interests of the public
generally, as distinguished from those of a particular class, re-
quire such interference; and, second, that the means are reason-
ably necessary for the accomplishment of the purpose and not
unduly oppressive upon individuals. The Legislature may not,
under the guise of protecting the public interests, arbitrarily in-
terfere with private business, or impose unusual and unnecessary
restrictions upon lawful occupations." (Mr. Justice Brown, in
*Lawton* v. *Steele,* 152 U. S., 133, 137).

"It will probably not be disputed that every one has a right to
pursue in a lawful manner any lawful calling which he may select.
The state can neither compel him to pursue any particular calling
nor prohibit him from engaging in any lawful business, providing
he does so in a lawful manner. It is equally recognized as beyond
dispute, that the state, in the exercise of its police power, is, as
a general proposition, authorized to subject all occupations to a
reasonable regulation, where such regulation is required for the
protection of public interests or for the public welfare. It is also
conceded that there is a limit to the exercise of this power and
that it is not an unlimited arbitrary power, which would enable
the Legislature to prohibit a business, the prosecution of which
inflicts no damage upon others." (Tiedeman's Limitations of
Police Power, Section 85).

"If the police regulation of trades and occupations can not be
instituted and enforced, except so far as a trade or occupation
is harmful or threatens to be harmful in any way to the public,
however slight the restraint may be, so much the more neces-
sary must it be to confine the exercise of the police power to the
prevention of the injuries with which the public is threatened by
the prosecution of a calling, when the law undertakes to deny
altogether the right to pursue the calling or profession. In pro-
portion to the severity or extent of the police control must the
strict observance of the constitutional limitations upon police
power be required. There is no easier or more tempting oppor-
tunity for the practice of tyranny than in the police control of
occupations. Good and bad motives often combine to accomplish
this kind of tyranny. The zeal of the reformer, as well as cu-
pidity and self-interest, must alike be guarded against. Both are
apt to prompt the employment of means to attain the end desired,
which the Constitution prohibits.

"It has been so often explained and stated that the police power
must, when exerted in any direction, be confined to the imposition
of those restrictions and burdens which are necessary to promote
the general welfare; in other words, to prevent the infliction of a

public injury, that it seems to be an unpardonable reiteration to make any further reference to it. But the principle thus enunciated is the key to every problem arising out of the exercise of police power. Applied to the question of prohibition of trades and occupations, it declares unwarranted by the Constitution any law which prohibits altogether an occupation, the prosecution of which does not necessarily, and because of its unenviable character, work an injury to the public. It is not sufficient that the public sustains harm from a certain trade or employment, as it is conducted by some who are engaged in it. Nor is it sufficient that all remedies for the prevention of the evil prove defective, which fall short of total prohibition. Because many men engaged in the calling persist in so conducting the business that the public suffer, and their actions can not otherwise be effectually controlled, it is no justification of a law which prohibits an honest man from conducting the business in such a manner as not to inflict injury upon the public." (Tiedeman, Section 102).

"Another more or less common mode of police regulation of employments is the determination of the localities in which the trade will be allowed. Very many trades are beneficial to society in general, and it would be unconstitutional to prohibit them altogether, and yet they may be subjected to whatever reasonable regulations may be needed to avert or prevent some special danger, which is threatened by the prosecution of them. * * * But the prohibition as to locality must be reasonable, in order that it may not offend the constitutional limitations." (Tiedeman, Section 104).

"As long as a trade does not injure the public health, and is the source of no annoyance whatever to the inhabitants of the locality in which it is conducted, it can not lawfully be prohibited. Every man has a constitutional right to follow on his premises any calling provided it does not in any way interfere with another's reasonable enjoyment of his premises. But if the prosecution of a certain trade affects another injuriously, the state may so regulate the trade that the injury may be avoided or reduced to a minimum. If the trade is in itself, and necessarily, harmful to one's neighbors, or to the public health, it may be prohibited altogether. But if it can be prosecuted under certain limitations so as to avoid injury to others, the police regulation must be confined to the imposition of these needed restrictions and the trade can not be absolutely prohibited.

"The police regulation can not extend beyond the evil to be remedied. Where, therefore, certain trades and employments, which serve some useful purpose and add something to the world's wealth, are harmful to the inhabitants of the locality in which they may be conducted; and the harm may be avoided altogether,

or considerably reduced, by confining them to localities in which the population is sparse and the residences are few, it is altogether permissible to prohibit the prosecution of those trades in other localities.  *  *  *  But in all these cases the prohibition must be confined to the removal of the evil to be guarded against. There can not be an absolute prohibition of a trade in a locality in which it may be prosecuted without annoyance or inconvenience to the neighboring residents." (Tiedeman, Section 122c).

It seems to us that the amendment of this statute fails to meet the tests mentioned by Mr. Justice Brown. It does not appear that the interests of the public generally require such interference, or that this restriction was necessary. We may concede that the prohibition of the carrying on of such a business within a reasonable distance of an asylum or other benevolent institution of the state, or of the public schools, or of a seminary might be in the interests of the public or conducive to the public welfare, but what interest of the public is subserved by the prohibition of the carrying on of such a business within four hundred feet of the administration department of a state penal institution? If this amendment is valid, we can not see why a law prohibiting the carrying on of such a business within four hundred feet of John Smith's house would not also be valid and certainly no one would claim that such an act could be justified on any ground of public necessity. And if not required by the public welfare, to permit such a restriction upon the use of this property merely in private interests would be in effect to take the plaintiff's property without due process of law. If the business is so conducted as to become a nuisance, John Smith would have a remedy, and so have the managers of the penitentiary, but the business is not necessarily or inherently a nuisance, and it may not, therefore, be declared to be one, nor can it be restricted from being carried on in a certain locality unless in the interests of the public, and no such interest appears. It follows, therefore, that the plaintiff should have been discharged and that the court of common pleas erred in confirming the judgment of the police court, and the judgments of these courts are reversed, and the plaintiff discharged with his costs.

*Geo. B. Okey* and *F. A. Davis,* for plaintiff.

*John M. Sheets,* Attorney-General, for defendant.